UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER FOR ENTRY OF JUDGMENT

* * * * * * * * * * * * * * * * * * *

Richard Budzak,

Plaintiff,

vs.

Northwestern Mutual Life
Insurance Company,

Defendant. Civ. No. 01-1117 (RLE)

* * * * * * * * * * * * * * * * * * *

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by the provisions of Title 28 U.S.C. §636(c). The Court Trial of this action commenced on May 5, 2004, and was completed on May 7, 2004, at which time, the matter was taken under advisement. At

the time of Trial, the Plaintiff appeared by Patrick M. Spott, Esq., and the Defendant appeared by Erik T. Salveson, Esq.

This action centers on the Plaintiff's claim that he is entitled to unpaid disability benefits, because he remains totally disabled under the terms of his insurance policy with the Defendant. In contrast, the Defendant contends that the Plaintiff is not entitled to further disability benefits, for the following two reasons: 1) he is not totally disabled, within the meaning of the Defendant's disability income policy, because he has been able to perform one or more of the principal duties of his regular occupation; and 2) he is not disabled as a result of an accident or sickness, as is required by the policy, because he has sufficiently recovered from his mental illnesses to return to work. The Defendant also contends that the Plaintiff's claim is limited to total disability, as opposed to partial disability.

Based upon the entirety of the Record before us, the files, Exhibits, and argument of counsel, and being fully advised in the premises, we now make our Findings of Fact, and Conclusions of Law, as follows:

II. <u>Findings of Fact</u>

1. The Plaintiff, who was the youngest of five children, including his sister MaryAnn Lucas Houx ("Houx"), was born on September 3, 1950, in Superior,

Wisconsin. Two of his siblings are deceased, one lives in Washington, D.C., and the other, Houx, lives in Duluth, Minnesota. The Plaintiff graduated from high school in 1968 and, during high school, he played on the golf team, and was a member of the National Honor Society. Following graduation, the Plaintiff spent the Summer with his sister in Washington, D.C., but returned home to attend college at the University of Wisconsin-Superior ("UWS"), which he attended from 1968 through 1972, at which time he graduated with a Bachelor of Science degree, with majors in Social Science and Education. The Plaintiff aspired to become a teacher and, although he was assured of a teaching position, he was drafted in October of 1972, served five or six months of active duty in Fort Polk, Louisiana, and was discharged six years later, while he was living in Florida. During that time, he alternately worked as a switchman on the railroad, as a grain elevator employee, and he performed odd jobs until he moved to Florida in early 1974. In Florida, he began working as a shipping clerk at the McArthur Dairy, and he was responsible for taking inventory, ordering supplies, and ensuring that proper quantities were on the delivery truck. The Plaintiff was employed at the McArthur Dairy, until 1977 or 1978.

2. In 1978, the Plaintiff began taking tests for the Department of Health and Rehabilitative Services ("HRS"). As his test scores improved, he changed positions

as a social worker and, through his work at HRS, he was involved in raising money for clothes for children who had been abused, as well as fulfilling the transportation needs for the elderly. After working at HRS for approximately a year, he began working for Store Cable Company, performing accounting work over the course of three years. The Plaintiff had been promised that he would be the next person to lead a cable system but, after he had trained two other people to perform that job, he resigned, and traveled to Florida with his girlfriend, Nancy Potta ("Potta"). He was hired by Pegasus Luggage Company, in Hialeah, Florida, where he worked for three and one-half years, until he had saved enough money to attend paralegal school. Potta had encouraged the Plaintiff to get a more professional job, and they had read that the paralegal career was quickly growing. The Plaintiff was accepted into an elite program, in Atlanta, Georgia, which was one of only two programs, east of the Mississippi River, that had been approved by the American Bar Association ("ABA"). To enter the program, an individual had to have a four-year college degree, with a 3.0 grade point average, or higher, which the Plaintiff satisfied. At that time, the program lasted one semester, but was very intensive, and now the same course is taught over a two-year period of time. The Plaintiff completed the paralegal course in May of 1983, with honors, and he received many job offers.

3. The Plaintiff accepted a position with a twelve-attorney law firm, which specialized in construction litigation, in order that he could work with J. Frank Bradley ("Bradley"), who was a highly reputed trial attorney in Miami, Florida. While living in Fort Lauderdale, Florida, the Plaintiff worked at the firm's Miami location, from 1983 through 1987, and then at the West Palm Beach location for a couple of years, before returning to the Miami office.[1] The Plaintiff worked with Bradley, for whom he had to write a lot of letters and, in doing so, Bradley taught the Plaintiff to write in a legal fashion, so that he could help the younger attorneys in the firm. The Plaintiff performed a variety of duties as a paralegal, including, inter alia, outlining depositions, attending Trials,[2] copying documents, and preparing witnesses. He worked from sixty

---

[1]Prior to the onset of the Plaintiff's mental health problems, and while he was living in Florida, Houx and her family stayed with him, at his condominium in Fort Lauderdale, when they were on vacation. On those occasions, the Plaintiff's house was neat, he took pride in his home, he seemed happy, and he enjoyed showing Houx, and her family, some of Florida's attractions.

[2]When the Plaintiff attended Trials with his employers, he listened, took notes, retrieved the necessary documents for the attorneys, wrote down questions, and conferred with the attorneys during breaks. Similarly, during this Trial, the Plaintiff took three pages of notes, as of the time of his testimony, and he discussed the case with his attorney, during breaks.

Further, the Plaintiff attended his own depositions, on two occasions, the first of which lasted for six and one-half hours, with a lunch break, and the second of

(continued...)

hours per week, up to one hundred hours per week, when the attorneys were in Trial, and he tried to schedule his work around the rush hour traffic, so he worked either from 7:00 o'clock a.m., to 7:00 o'clock p.m., or from 7:00 o'clock a.m., to 3:00 o'clock p.m., after which he took a notebook home with him.

4. In 1991, the Plaintiff applied for a disability policy, see Exhibit 1,[3] because he had witnessed a number of attorneys "break down," and Bradley had undergone triple bypass surgery. The Plaintiff had not had any prior mental health issues, or treatment, prior to applying for the policy. The policy was issued on August 16, 1991, and the Plaintiff read it, and understood its terms, as he had reviewed hundreds of insurance policies, through his work as a paralegal. The Plaintiff understood that the rights and responsibilities of the parties were governed by the

---

[2](...continued)
which lasted four hours, with a lunch break. He was able to sit through both of his depositions, and the testimony at Trial, without suffering a panic attack.

[3]The only Exhibits offered, or admitted at Trial, were those of the Defendant, with the exception of Exhibit 3, which is the Plaintiff's Exhibit that contained his medical records, and that was substituted for the Defendant's Exhibit 3. Therefore, for ease of reference, we simply refer to the Exhibits by their number.

policy, and that, to be entitled to benefits, he had to satisfy the requirements of the policy.[4]

5. The Plaintiff first experienced mental health problems in December of 1994.[5] The Plaintiff was at a shopping mall, and thinking about a conflict with one of his co-workers, when he began to feel ill, so he went home. He experienced chest pain and shortness of breath, his heart was racing, and he was sweating, even after he took a cold shower, and he thought that he could not breathe, and that he was having a heart attack. The Plaintiff called an ambulance, which took him to the hospital, and his

[4]Section 1.2 of the policy governs total disability, and states that, "[u]ntil the end of the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation" and, "[a]fter the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation and is not gainfully employed in any occupation." Exhibit 1. Additionally, the policy provides that "[b]enefits are provided for the Insured's total or partial disability only if * * * the disability results from an accident or sickness." Id. Finally, under the terms of the policy, the Plaintiff was required to do certain things, such as submit forms to the Defendant, so that they could access his records, in order to review his claim.

In interpreting the language of the provisions in the policy, the Defendant pays attention to, and abides by judicial decisions, and it has interpreted the provision on total disability to require a claimant to be unable to perform **all** of the principal duties of his occupation. Therefore, if a claimant can perform one or more of the principal duties, he or she is not disabled.

[5]However, the Plaintiff had a sleeping disorder, which began one to two years before the panic attacks, during which he arose at 3:00 o'clock a.m., and worked for a half a day on the computer, before going to the office.

blood pressure was recorded as 220 over 160 to 180. He remained at the hospital for four to five hours and, although no one informed him that he had experienced a panic attack, he was instructed to see his family doctor, on the following Monday. Upon visiting Dr. Sinclair, who had been treating the Plaintiff for high blood pressure, he was prescribed Zoloft,[6] which was unable to control the panic attacks. After the Plaintiff experienced a series of panic attacks within a few days, Dr. Sinclair referred him to Dr. Thomas Schvehla ("Schvehla"), who is a psychiatrist. While waiting to see Dr. Schvehla, the Plaintiff began to have another panic attack, and Dr. Schvehla reportedly commented that it was one of the worst attacks that he had ever seen. The Plaintiff continued to treat with Dr. Schvehla, and he also received psychotherapy from Mary Canane ("Canane") until 1997, when he left Florida. In addition to the Plaintiff's blood pressure medications, Dr. Schvehla prescribed Xanax,[7] and Ambien,[8] which were the only medications to greatly decrease the Plaintiff's panic attacks. The Plaintiff stated

[6]Zoloft "is indicated for the treatment of major depressive disorder." Physicians' Desk Reference, p. 2682 (59th Ed. 2005).

[7]Xanax is "indicated for the management of anxiety disorder * * * or the short-term relief of symptoms of anxiety." Physicians' Desk Reference, at 2764 (59th Ed. 2005).

[8]Ambien "is indicated for the short-term treatment of insomnia." Physicians' Desk Reference, at 2980 (59th Ed. 2005).

that he was also taking nortriptyline[9] for depression. At the end of the Plaintiff's treatment with Dr. Schvehla, the prescribed dosage of Xanax was doubled, but that amount was too much, and the Plaintiff was not able to function at that dosage. During the Plaintiff's psychotherapy sessions, Canane gave the Plaintiff tapes, and books, and she taught him meditation, and the Plaintiff also began to exercise daily over lunchtime, at Bally's.

6. The Plaintiff questioned whether he should return to his work as a paralegal. He was unable to sleep, without having frequent panic attacks, unless someone was in the house and, for a time, he lived with the father of one of the attorneys, with whom he worked. Additionally, the Plaintiff suffered side effects from his medications -- in particular, his blood pressure medication -- which gave him gas, and diarrhea, and which caused him to have a metallic taste in his mouth. The Plaintiff was permitted to go into work whenever he wanted to, and he began to increase his hours. However, the Plaintiff thought that he had lost fifteen to twenty percent of his ability to work, and in his concentration. In response to his concerns, he was

[9]Nortriptyline hydrochloride is "a tricyclic antidepressant * * * used to treat symptoms of depression and to relieve chronic severe pain." <u>Dorland's Illustrated Medical Dictionary</u>, pp. 1234, 1307 (29th Ed. 2000).

informed that, following the 1995 calendar year, a different compensation package would be developed. During that time, he also played golf, or at least, hit golf balls, and he became engaged to Vicky Berong [phonetic], but that relationship ended, following her mother's heart attack, and her decision to return to Atlanta.

7. Beginning in 1995, when he started to receive treatment for his mental health issues, the Plaintiff had regular telephone conversations with Houx, which were depressing, and negative. Each time, Houx spent ten to fifteen minutes on the telephone just trying to get him to a point where he was okay, and she began to dread his phone calls, because the majority of the time was spent trying to cheer him up. The Plaintiff sometimes screamed at Houx to get down to Florida, which she did on two separate occasions, and her husband did, as well, on another occasion. Houx's first visit to the Plaintiff was in late 1995, or 1996. At the time, she was receiving weekly telephone calls and, when she saw him, she observed that he was extremely nervous, and he told her that he did not want to be alone. While Houx was in Florida, the Plaintiff got better, and they spoke about how he could get help. She noted that he had started to see a psychiatrist, and a psychologist on a regular basis, and she suggested that he could call a friend, or go to the emergency room, if things became bad. Houx visited the Plaintiff a second time in early 1996, after he was apparently

hospitalized for a time, and she observed that he was much more nervous, and had lost some of his confidence. Houx visited the Plaintiff's place of employment, and spoke with his boss, who told her that he was going to reduce the Plaintiff's workload because, even working part-time, the Plaintiff worked harder than others who worked full-time.

8. By 1996, the Plaintiff's panic attacks had stopped. Nevertheless, the Plaintiff was still calling Houx, and screaming at her that he needed help and, as a result, Oliver, who is Houx's husband, went to Florida in either 1996, or 1997. At the time that he was fired from his job, in 1997, the Plaintiff thought that his mental health condition was okay, because he could function, and go to work, despite increasing problems within the law firm. In fact, the Plaintiff had returned to work full-time, and he billed 2,000 to 2,500 hours per year, until September of 1997. In later filing his claim for disability, the Plaintiff represented to the Defendant that his termination was not attributable to his sickness, but rather, was due to conflicts within the law firm, such as the unprofitability of cases, the mismanagement of the firm, and the Plaintiff's receipt of money that allegedly did not belong to him.

9. Following the Plaintiff's termination in 1997, he had a series of panic attacks, and Houx came to Florida to help him move to Duluth, Minnesota. Before his

move, the Plaintiff had continued to converse with Houx on a regular basis, and they had discussed the possibility of moving back to Duluth, where he would have a support system. The Plaintiff chose to move to Duluth, in order to live with his sister, because he was unable to sleep alone in his house, as he was still having panic attacks, and his depression had reached a serious stage, at which he did not care about anything, and could not handle things, such as getting the mail, and paying bills. He arranged for the sale of his house, with a realtor. When Houx arrived, she assumed that he would be packed, and ready to go, but the Plaintiff informed her that he was not going to pack, and instead, he was just going to walk out of the house. He appeared to be in a "zombie-like state," lethargic, and unaware. The Plaintiff was in a daze, he hardly interacted with them, and he stared off into space. Houx packed the Plaintiff's possessions, and placed them in storage, where they remained for about one year. The Plaintiff followed Houx, in his car, to Orlando, where Houx's son met them, and drove the Plaintiff's car the rest of the way to Duluth, while the Plaintiff rode with Houx. Even after he felt that he was stabilized, the Plaintiff reportedly experienced fear, anxiety, perspiration, increased blood pressure, tremors, diarrhea, and a feeling of hopelessness.

10. The Plaintiff lived with Houx, and her family, from December of 1997, through June of 1998. Houx testified that, during that time, the Plaintiff was not the brother that she knew, in that he walked around in a daze, he was taking medications, he was depressed, moody, and argumentative, and he did not care what he said, or how he appeared. The Plaintiff started numerous fights, regardless of what had been said, he shouted, and he walked around the house all night. Houx cleared out a bedroom for the Plaintiff, and she and her husband frequently escaped to their computer room, to get away from him. Since Houx's son had driven the Plaintiff's van to Duluth, he had a vehicle available to him while he stayed at her house, but he seldom drove during that period of time, because he had a panic attack, on one occasion, when he was driving back from the shopping mall, and there was snow on the road. Additionally, the Plaintiff felt that he was endangering others by driving, because he had tremors, his reflexes were bad, and his reaction time was poor. Instead, Oliver -- Houx's husband -- gave him rides. Once Spring arrived, the Plaintiff began driving again, although not on a regular basis.

11. Finally, one night, the Plaintiff told Houx that he did not want to stay with them anymore, and he blamed Houx for what had happened to him. She informed him that he was free to leave and, after the Plaintiff continued to rant and rave, she told

Oliver that she could not take it anymore, and went to her bedroom. Houx composed a letter, asking the Plaintiff to leave because of his negative impact and, unbeknownst to her at the time, Oliver told the Plaintiff that he had to leave, because he was destroying their family. According to the Plaintiff, he had been having conflicts with Houx, and had been experiencing erratic sleep, and he informed Oliver that he could not stay there any longer, at which point in time, Oliver offered to drive him to a hotel. The Plaintiff moved out of the Houx household in June of 1998, and he stayed in motels, moving a couple of times, for approximately a month, before he bought his current residence, where he has lived since the middle of 1998. Houx did not have any in-person contact with the Plaintiff from June of 1998, through the Spring of 2002, but she began to receive vicious letters from the Plaintiff, in November of 1998, in which he called her and her husband names, blamed her for everything that had happened to him, and accused her of not paying for things. When Houx's children read her letters, in the Summer of 2000, they told her that she had to stop it, for her own personal health, and her son told her that his children could not come to Houx's house, because of the Plaintiff's mental instability. As a result, the Plaintiff changed the locks on her doors, and she contacted an attorney, who wrote to the Plaintiff, and directed him to

stop sending letters, or trying to see Houx, or a Restraining Order would be obtained. The Plaintiff then stopped sending Houx letters.

12. When the Plaintiff returned to Duluth, he began receiving treatment with Walter E. Plude ("Plude"), at the Arrowhead Psychological Clinic. According to the Plaintiff, Plude was shocked that he had been taking Xanax for three years, due to its highly addictive nature, and Plude terminated that prescription, and instead, prescribed BuSpar,[10] which caused the Plaintiff to have "Star Wars" tremors in bed, which he described as one-half hour to one hour of tingling, with "fireworks," and explosions shooting through his body. After he stopped taking Xanax, the Plaintiff felt that his mental health became worse. Plude also planned to wean the Plaintiff off of Ambien, but Dr. Timothy J. Egan[11] did that later. The Plaintiff was hospitalized, in May of

---

[10]BuSpar is a "trademark for a preparation of buspirone hydrochloride," which is "used in the treatment of anxiety disorders and for short-term relief of anxiety symptoms." Dorland's Illustrated Medical Dictionary, at 257 (29th Ed. 2000).

[11]Dr. Egan's testimony was entered by way of a deposition transcript, and accompanying Exhibits. Throughout Dr. Egan's deposition, the Defendant interposed numerous objections, most of which were based on the leading nature of the questions from the Plaintiff's attorney, on direct examination. The parties agreed that we could rule on the objections, when we reviewed Dr. Egan's deposition. Although the objections, concerning the leading nature of the Plaintiff's inquiries, are well-taken, we overrule them because, in all likelihood, had we been available to sustain the objections at the time of the deposition, the Plaintiff would have simply rephrased the questions

(continued...)

1998, after he was asked to leave the Houx household, and following the Plaintiff's hospitalization, the prescription for Xanax was eventually replaced by a "green pill," which the Plaintiff continued to take at the time of Trial.

13. The Plaintiff was hospitalized for about a week or so, beginning on May 20, 1998. When the Plaintiff was treated in the emergency room of St. Mary's Medical Center, he was complaining of increased anxiety. See, Exhibit 3.[12] The Plaintiff was

---

[11](...continued)
in a non-leading form. Further, on numerous occasions, the Defendant objected to the discussion of specific comments in the Plaintiff's medical records as cumulative. However, since the Defendant also made specific reference to the Plaintiff's medical records, we overrule those objections, as well. We will note, in our Findings of Fact, when we have sustained an objection.

By way of background, Dr. Egan obtained his undergraduate degree from St. John's University in 1975, and his medical degree from the Medical College of Wisconsin in 1979. He completed a one-year rotating medical internship at the Portsmouth Naval Hospital, in Virginia, and a three-year residence in psychiatry, after which he served for three years as the director of medical services, and the staff psychiatrist, at the naval hospital in Puerto Rico. Dr. Egan then returned to Virginia, where he taught in the residency program in 1986 and 1987, before leaving the Navy and coming to the Duluth Clinic, where he continued to treat patients, at the time of his deposition. Dr. Egan has been board certified, by the American Board of Psychiatry and Neurology, since 1985. He stated that he was being reimbursed for his deposition testimony, but he was not certain of the exact arrangements.

[12]Exhibit 3 is the entirety of the Plaintiff's medical records as they were submitted, which are not paginated, and therefore, do not enable us to refer to a specific page. However, the records appear to be largely chronological and, for the
(continued...)

later transferred from the emergency room, and into the care of Dr. Egan, whose first contact with the Plaintiff is recorded in the "History and Physical Examination," which was taken on May 20, 1998. Id. The Plaintiff complained of depressed mood, loss of interest, crying spells, decreased appetite, undocumented weight loss, poor concentration and memory, and passive suicidal ideation.[13] Id. Dr. Egan testified that the symptoms of depression and anxiety included being lethargic, or having a general feeling of being tired; sleeping too much; suffering from insomnia; having the subjective sense of having a poor memory; having difficulty concentrating and focusing; being jittery; becoming easily agitated; having trouble socializing; thinking negatively; experiencing diarrhea, which could also be a side effect of medication; being nervous; having racing thoughts, and excessive fears; having heart palpations, as well as pain and pressure in the chest; being restless; having tight and tense muscles; trembling and shaking; becoming easily exhausted; and having a low self-esteem.

[12](...continued)
most part, we try, instead, to refer to a specific date, or time frame.

[13]At the time of his initial mental status examination of the Plaintiff, Dr. Egan noted that the Plaintiff was alert, cooperative, and oriented to all spheres; his speech was normal; his thought processes were logical, goal-directed, and without evidence of a formal thought disorder; he did not have any delusions or hallucinations; his immediate recall, recent memory, and remote memory were intact; and his insight and judgment were influenced by his impulsivity.

Additionally, Dr. Egan testified that someone who was depressed might have a preoccupation with feelings of guilt or worthlessness, hopelessness, suicidal thinking, crying spells, a loss of interest in usual activities, poor energy, and poor libido. While the Plaintiff was hospitalized, Dr. Egan observed one of his panic attacks, but he had not observed another one since that time.

14. After the Plaintiff was discharged from the hospital in June of 1998, he was partially hospitalized for an additional two weeks. The Plaintiff subsequently ceased treatment with Plude, as he was dissatisfied with Plude's handling of the medication change, and Dr. Egan became his doctor, and the Plaintiff continued to treat with Dr. Egan, for the ensuing six years.[14] Dr. Egan adjusted the Plaintiff's medications, which caused some side effects and, although the Plaintiff's panic attacks

[14]Dr. Egan testified that he had the opportunity to review some of the Plaintiff's records from his treatment in Florida, and he was asked to review several of those records at his deposition. For instance, based upon one of the records from Dr. Schvehla, dated March 1, 1995, which Dr. Egan did not recall if he had previously seen, Dr. Egan stated that the Plaintiff was working with his symptoms. See, Exhibit 3. As of November 11, 1997, the Plaintiff had been treating with Dr. Schvehla for approximately three years, for anxiety and depression. Id. Dr. Egan testified that the three diagnoses listed on Axis I -- namely, 296.22, 300.02, and 300.01 -- referred to diagnoses for depressive disorder and anxiety disorder, and that those diagnoses were similar to Dr. Egan's, in 1998. Dr. Egan confirmed that Plude's treatment note of November 20, 1997, diagnosed the Plaintiff with panic attacks and a major depressive disorder, which was also consistent with Dr. Egan's diagnoses. Id.

had stopped, he still experienced tremors. Dr. Egan's treatment consisted solely of medication management,[15] and the Plaintiff saw Dr. Egan once every three months for office visits, or every six weeks when he was changing his medications. Each appointment with Dr. Egan lasted approximately fifteen to twenty minutes. Dr. Egan never provided any psychotherapy to the Plaintiff, nor did he conduct any psychological testing. Throughout the course of Dr. Egan's treatment of the Plaintiff, his diagnoses of a major depressive disorder, and a panic disorder, remained unchanged.[16]

15. On June 8, 1998, the Plaintiff first submitted a claim to the Defendant, in which he claimed that his disability began on October 1, 1997, even though he had

[15]Throughout Dr. Egan's testimony, he was asked to explain the uses of the Plaintiff's various medications. To the extent that we have listed his medications in our Findings of Fact, we have referenced the Physicians' Desk Reference, and Dorland's Illustrated Medical Dictionary, and therefore, it is unnecessary for us to include Dr. Egan's testimony, in that respect.

[16]Dr. Egan testified that he had not reviewed any other documents, in connection with the Plaintiff's case, prior to his deposition, or for any other purpose. Specifically, Dr. Egan did not recall viewing the Plaintiff's employment record, his grade records, his school papers, the deposition testimony of the other witnesses, the Defendant's claims file, the pertinent insurance policy, or the report from the independent medical evaluation ("IME"). He further stated that he may have seen one or two of the Plaintiff's letters to the Defendant, if the Plaintiff had brought them to him.

testified that his disability began on September 24, 1997 -- the date of his termination of employment.[17] See, Exhibit 25. The purpose of the disability benefits form is to allow the Defendant to obtain certain information from the insured, such as the identification of the claimant's occupation, as well as its physical requirements, a list of treating physicians, the date the disability began, whether the claimant is covered by other companies, and whether he or she has applied for other disability benefits. The Plaintiff identified his job as a paralegal in civil litigation, specializing in construction litigation, and he listed his duties, which included, inter alia, report letters, trial attendance and analysis, discovery document review, and deposition preparation. Id. The Plaintiff also executed an authorization for the release of medical records.[18] Id.

[17]The policy required written notice of a claim within sixty (60) days of the loss. See, Exhibit 1. Although the Plaintiff did not comply with that requirement, the Defendant did not deny benefits on that basis. The policy also required the Plaintiff to submit attending physicians' statements to the Defendant, on a monthly basis, primarily because sicknesses can change on a daily, or monthly basis, and it was important to have an ongoing understanding of a claimant's illness, and activities. Id. The Plaintiff tried to submit the forms every month but, to accommodate him, the Defendant agreed to permit him to submit attending physicians' statements every other month instead. The Plaintiff did not submit any statements, after July of 2000, allegedly because he did not receive any additional forms. The Plaintiff's benefits were terminated in August of 2000.

[18]The Plaintiff acknowledged that he was obligated to authorize the gathering of his medical information, and that, by executing the authorization, he was permitting his

(continued...)

The Plaintiff asserted that he had been totally disabled, since his termination of employment in 1997, that he was unable to perform any of the principal duties of his occupation as a paralegal, from that time until June 8, 1998, and that his claim was limited to total disability.[19] Id. The Plaintiff stated that he applied for disability at that time, because Dr. Egan was more straightforward about his condition, and his abilities in the future, and the Plaintiff realized, for the first time, that he was disabled.

---

[18](...continued)
doctors to release full information, concerning his condition, as well as to communicate with the Defendant, either over the telephone, or through written correspondence. However, on March 16, 2000, the Plaintiff wrote a letter to the Defendant, in which he objected to the Defendant speaking to, or corresponding directly with, his doctors. See, Exhibit 38. Further, on at least two different occasions, the Plaintiff referenced his rescission of the release. See, Exhibits 36, and 38. The Defendant did not terminate the Plaintiff's benefits as a result of his failure to disclose medical records, but rather, it attempted to evaluate his claim without the authorizations, because the Defendant was not comfortable with the tenor, and tone, of the Plaintiff's letters. Later, the Defendant received authorizations for St. Mary's Duluth Clinic, and it was able to request medical records from July of 2000, to the commencement of the lawsuit.

[19]Mark Schwallie ("Schwallie"), who is an employee of the Defendant, testified that he received dozens of communications from the Plaintiff, who consistently stated that he could not return to his duties. Schwallie further testified that neither the Plaintiff, nor his attorneys, ever characterized the claim as one for partial disability and, from the outset of the claim, up until the present time, the Defendant has treated the claim as one for total disability only.

16. When the Plaintiff filed his claim, it was assigned to Mary Fergal ("Fergal"), who began attempting to contact the Plaintiff, and who initially made the decision to pay him benefits. Generally, the initial handling of a claim involves gathering information, interviewing the claimant, and obtaining attending physician statements. Following the initial medical review, the claim is assigned to an analyst. An IME is common in psychiatric claims, and it was performed in the Plaintiff's case. In deciding whether to grant or deny a claim, the entire file is examined, in conjunction with the IME. When a claim is filed, and approved, the benefits are conditioned on proof of disability, which is needed on an ongoing monthly basis, and therefore, the claim is continually monitored. After the Plaintiff submitted his claim, the Defendant responded by sending him a letter acknowledging the claim, and by conducting an interview, which was completed by Mr. Hankes. See, Exhibit 28. The interview is an important tool in obtaining an understanding of the claim directly from the insured, beyond that which is stated in the forms. The Defendant approved the claim, and retroactively paid benefits to March of 1998, in accordance with the determination that the Plaintiff's beginning date of disability was December 3, 1997, and the Defendant continued to pay benefits, until they were terminated in August of 2000. See, Exhibit 54 and 55. In the interval, the Plaintiff submitted regular requests for continuance of

total disability benefits, which provided for changes of address, changes in employment, current activities, and places of treatment, and which are designed to assist the Defendant in evaluating whether a claimant is still eligible to receive benefits. See, Exhibit 27. The Plaintiff did not make any reference to a claim for partial disability benefits, in submitting those forms. Id. The Plaintiff also submitted attending physicians' statements, which are completed by the treating physicians, and which provide the Defendant with a "snapshot" of a claimant's current condition, diagnosis, symptoms, treatment, and prognosis. See, Exhibit 26. Although there were several occasions when the Plaintiff's attending physicians' statements were late, the Defendant continued to pay benefits, and eventually adjusted that requirement, by allowing the Plaintiff to submit the statements every other month.

17. In July of 1998, the Plaintiff began receiving psychotherapy with Jacqueline Lund ("Lund"). See, Exhibit 3. The Plaintiff was satisfied with the therapy that Lund provided, in terms of establishing goals which, he felt, that he had achieved. Id. In Lund's treatment note from July 31, 1998, she stated that he had brought in numerous documents, which were related to his claim of disability, that he was playing golf on a regular basis, and that he presented himself as helpless, and became defensive when she questioned his motivation for therapy, and she suggested that he

terminate therapy, if his focus was disability, as opposed to a change in behavior.[20] Id. The Plaintiff could not recall those conversations, and he questioned the accuracy of Lund's statements, but he recalled bringing in the monthly claim form that he had to send to the Defendant, which he needed her to sign, and he stated that he was hitting balls at Nemadji, but that he had not purchased a season pass. Lund renewed her concerns, on August 10, 1998, and she subsequently noted that the Plaintiff's last appointment was on that date, after only four sessions, when they mutually agreed to terminate therapy, due to those same concerns. Id. At the time of his discharge, Lund opined that the Plaintiff's prognosis was good, if he was able to obtain disability, and she noted that he was able to play golf on a daily basis, weather permitting. Id. She

[20]Dr. Egan testified that the Plaintiff did not bring him a lot of documents relating to his disability, but he used to bring in a written synopsis of the events since the last appointment, which was well-organized, and made sense. However, Dr. Egan testified that the Plaintiff's synopses were done in an obsessional way, in the sense that he was preoccupied with his distress, and that they sometimes contained discrepancies. After noting Lund's comment, that the Plaintiff sought her support for his disability claim, Dr. Egan testified that he and the Plaintiff had discussed the issue from time to time, but it was not a major part of their discussion, and the Plaintiff did not overtly seek his assistance. Based on his experience with Lund, Dr. Egan testified that, in order for her to write her comments in the records, she honestly found them to be true.

also found that his Global Assessment of Functioning ("GAF") was 60.[21] Id. Again, the Plaintiff disputed some of Lund's assertions.

18. In September of 1998, Dr. Egan noted that, in June of 1998, he had increased the Plaintiff's prescription for Clonazepam,[22] because the Plaintiff was still having panic attacks. See, Exhibit 3. At that time, the Plaintiff complained of memory and concentration deficiencies. Id. In October of 1998, Dr. Egan completed a form for the Defendant, in which he listed the Plaintiff's GAF as 41-50, which represented "[s]erious symptoms OR any serious impairment in social, occupational, or school functioning." See, Exhibit 2, at 198-99. In January of 1999, the Plaintiff reported having difficulty sleeping, as well as sleeping too much; anxiety, without the presence of panic attacks; subjective concentration problems; and diarrhea. Id. Then, in February of 1999, after not having received any psychotherapy for the previous six

[21]Dr. Egan testified that the GAF represents an attempt to assess the level of an individual's functioning, and that a score of 60 was "okay."

[22]Clonazepam is a benzodiazepine, which is "any of a group of minor tranquilizers, having * * * similar pharmocological activity, including antianxiety, sedative, hypnotic, amnestic, anticonvulsant, and muscle relaxing effects." Dorland's Illustrated Medical Dictionary, at 204, 365 (29th Ed. 2000).

months,[23] the Plaintiff again began attending psychotherapy with Linda H. Schwartz ("Schwartz"), at the referral of Dr. Egan. Id. Dr. Egan made the referral, for some ongoing psychotherapy, in order to help the Plaintiff deal with the symptoms, in addition to the medication management that he was providing, and he viewed his and Schwartz's treatment of the Plaintiff as working together as a team. Id. Dr. Egan characterized Schwartz's therapy as supportive, as opposed to cognitive behavioral therapy. The Plaintiff felt that Schwartz's psychotherapy was more effective than Lund's, and he did not recall any major problems with her. In September of 2000, Schwartz observed that the Plaintiff was buoyant and happy, and he informed her that he had not been feeling depressed. Id. He was excited about finishing school, going into business, and beginning a new romantic relationship.[24] Id. As a result, Schwartz terminated his therapy, because the Plaintiff had progressed so well, and the Plaintiff has not received any psychotherapy since that time. Id.

---

[23]Dr. Egan agreed that the Plaintiff probably should have continued to receive psychotherapy, but he suggested that the Plaintiff might not have wanted to go back into psychotherapy, during that time.

[24]Dr. Egan testified that neither of the two essential features of major depressive disorder were present, given the Plaintiff's lack of a depressed mood, and his considerable interest in school, and other things, so he would not qualify as being diagnosed with major depressive disorder, as of that date.

19. While the Plaintiff was partially hospitalized, he attended therapy sessions, in which he discussed his alternatives, what he should be doing, and what schooling, or career field, he should be considering. The Plaintiff stated that the emphasis in attending school was socialization, and a means to reenter society. As a result of those discussions, the Plaintiff visited with Clarence Sharpe ("Sharpe"), who was in charge of adult, and non-traditional students, and who had given the Plaintiff information on a program at the University of Minnesota-Duluth ("UMD"), which would result in his becoming a representative for the Occupational Safety and Health Administration ("OSHA"). The Plaintiff had a background in, and was already familiar with, seventy-five percent of the required courses, but he had to take the Graduate Record Examination ("GRE"), in order to be accepted into the program, and he was unable to pass the GRE, despite taking it several times. Instead, the Plaintiff attended Lake Superior College ("LSC"), from the Fall of 1998, through the Spring of 1999. In the Fall of 1998, he took four classes geared toward becoming an occupational therapist, or a physical therapist assistant, which placed him close to the cutoff level between being a full-time, and a part-time student. The Plaintiff received "A" grades in two of his classes, but he received a "W" in the other two -- namely, Medical Terminology and Human Anatomy -- because he withdrew from those classes, due to

the difficulties that he was having. See, Exhibit 7. With respect to the two classes from which the Plaintiff withdrew, he attributed his difficulties to "fill-in-the-blank" questions, which he was unable to complete, even though he could have performed well had the questions involved matching, or multiple choice. The other two classes involved completing assignments, writing papers, and taking tests but, for the tests, each student was allowed to have one or two partners with whom to work, as well as a one-page "cheat sheet." The Plaintiff received the highest grade in the class, and he was informed that his writing abilities on his papers were so outstanding that it would have been unfair to the other students to grade their papers against his. In addition, he stated that he sometimes had to give oral presentations, which he was able to complete successfully, and without having a panic attack.

20. The Plaintiff explained that he became overwhelmed, as he had taken on too much, but he attended discussion groups for people with disabilities, which helped. Physically, the Plaintiff had gas caused by his medications and, as his tension and anxiety grew, particularly toward testing time, he had increased problems with diarrhea, and he was still being treated for depression and anxiety.[25] Following the Fall

[25]Dr. Egan testified that symptoms have to be present for a long enough period (continued...)

Semester, the Plaintiff was placed on academic probation, because he had failed to pass a certain percentage of his classes, due to his withdrawal from two courses. He met with Molly Johnson, and opted to take courses, with his success rate in mind, in order to help get him off of probation. In the Spring of 1999, the Plaintiff took three additional courses, and he received "A" grades in all three. The Plaintiff compared the completion of a map project, for one of his classes, to doing charts and preparing exhibits, and he stated that he was able to use his background in preparing Trial exhibits, and documentation for experts. The Plaintiff stated that he did an outstanding job on the project. However, he stated that it differed from his past experience as a paralegal, because he had plenty of time to prepare for his school projects. During that time, the Plaintiff was also hitting golf balls at a driving range, and putting.[26]

---

[25](...continued)
of time, in order to make a diagnosis but, afterwards, they can vary in severity, and there can be specific psychological or social precipitants that exacerbate the symptoms.

[26]In July of 1999, Schwartz encouraged the Plaintiff to sign up for a golf tournament as a way of meeting people. See, Exhibit 3. When Dr. Egan was asked why Schwartz might have made that recommendation, the Defendant objected on the grounds of lack of foundation. Since Dr. Egan himself testified that he would only be speculating as to Schwartz's reasoning, we sustain the objection, and strike Dr. Egan's statement, which immediately precedes the Defendant's objection. However, Dr. Egan testified that socialization can be beneficial for depressed patients, and his testimony
(continued...)

21. After the completion of his second semester at LSC, the Plaintiff decided to leave, because of his concerns about being on probation, even though, at that time, he was a student in good standing, and because he knew that he would not be able to pass the Medical Terminology course. Around that time, he saw an advertisement for the mediation program at UWS, which he thought looked interesting, and he decided to register. During his work as a paralegal, the Plaintiff participated in as many as two hundred mediation sessions, and he had settled cases himself. UWS has a four-year program, which is geared toward attaining a Bachelor of Arts degree in Legal Studies, as well as two companion programs -- namely, Paralegal Studies, which is a twenty-five credit certification program, and a mediation certification, which required eighteen credits. The Plaintiff became intrigued with mediation, and he decided to individually design a program to combine mediation and Legal Studies. However, he did not take any "purist" paralegal courses. The Plaintiff attended UWS for six semesters, including a "J-term" class,[27] from the Summer of 1999, through the Fall of 2000, and he graduated with a second major in Legal Studies and mediation. In order to obtain

(...continued)
in that regard, will stand.

[27]A "J-term" class is a single intensive course, which spans four weeks during the month of January.

credit for the classes that he had taken at the paralegal school in Atlanta, he had to prepare a paper, describing those classes, and he was able to obtain credit for the classes, as listed on his transcript. See, Exhibit 11.

22. Dr. Maria Cuzzo ("Cuzzo") is an attorney, and a professor of Legal Studies at UWS, and she was the Plaintiff's instructor for most of the classes in which he enrolled at UWS, she served as his advisor, and she supervised his fellowship. Although Cuzzo did not have a social relationship with the Plaintiff, she did attend a dinner at which he was present, following the Plaintiff's engagement to Carol Maupins ("Maupins"), who was a mutual friend. At a preliminary meeting between Cuzzo and the Plaintiff, which occurred shortly after his reentry at UWS in the Summer of 1999, the Plaintiff informed her that he could not be a full-time student,[28] because of "emotional issues." Cuzzo did not often encounter individuals who needed to be part-time students, over an extended period of time. While he attended UWS, the Plaintiff maintained part-time status, as a student, with the exception of the Fall of 2000, when he took twelve credits, half of which were attributable to his fellowship, and his

[28]Full-time status is maintained by taking between twelve and eighteen credits per term, while part-time status is maintained by taking between six and twelve credits per term.

participation in Mock Trial. Each of those programs afforded the Plaintiff with a great deal of latitude.

23. During the Summer sessions, in which the Plaintiff took three courses the first Summer, and two courses the following Summer, which met from 5:00 o'clock p.m., to 9:30 o'clock p.m., three nights per week, for a total of six to eight nights, as well as J-term, Cuzzo observed the Plaintiff in class only. Cuzzo explained that the Plaintiff became progressively tired throughout the evening, and he would "nod off" on occasion. While his comments at the beginning of class were insightful, focused, and helpful, they sometimes became less focused, confused, and incoherent but, on other nights, he was engaged for the entire class.[29] Similarly, on some nights, the Plaintiff was impeccably groomed but, on others, he arrived unshaven, and wearing poorly matched clothes. Although the Plaintiff was sometimes obstinate during a discussion, Cuzzo never observed the Plaintiff become angry, or belligerent. During the regular sessions -- namely, Spring and Fall terms -- Cuzzo also interacted with the Plaintiff approximately once every other week, during office hours and, while he was

[29]The Plaintiff acknowledged his occasional difficulties in his contributions to class participation, and he stated that, when Cuzzo sent him signals that his answers were inappropriate, he did not engage.

enrolled in the fellowship program, she saw him on a weekly basis for fifteen minutes each time. At those times, Cuzzo observed that the Plaintiff displayed the same variance in behavior and appearance, as he did during the Summer sessions, but that it occurred in three-week cycles.

24. Cuzzo reviewed the courses that the Plaintiff took at UWS, see Exhibits 11, and 12, which required participatory interaction, research, oral argument, term papers, and examinations. Those requirements were similar to some duties that are performed by paralegals, except that the Plaintiff's work was even more demanding than a paralegal's, because he was held to academic, as opposed to commercial, standards.[30] An "A" grade is earned by performing superior work, and the Plaintiff was graded according to his work, he was treated the same as other students, and he

[30]The Plaintiff also discussed the nature of his course work, which included writing papers, completing projects, and performing oral presentations. The Plaintiff stated that the courses involved skills, which he had already developed as a paralegal, and that he performed tasks, which were similar, in some instances, to work that he had completed as a paralegal. He stated that, in comparison to his duties as a paralegal, his duties in class were the same as when he worked as a paralegal, and that "writing is writing," and "research is research," but he explained he had a large time frame to complete the projects, and he would attempt to begin the projects immediately, because he knew that there would be times when he would be tired. He related that he slept continuously between his semesters at UWS, and that he sometimes slept for long periods of time, after the completion of a project, as well.

completed his work on time. The Plaintiff received "A" grades in all of his classes, except for two courses, in which he received "A-" grades, and Cuzzo described him as an excellent student. In Cuzzo's view, the Plaintiff was able to earn "A" grades, because he was not attending school full-time, with the exception of Fall of 2000, he had fifteen weeks to complete his assignments, and his due dates were never closer than three weeks apart, which meant that he could work at his own pace, and that contributed to his success. The Plaintiff's goal was to complete his program of study by the Fall of 2000, and he satisfied that goal on time. The Plaintiff was able to communicate, to Cuzzo, the challenges that he faced, and he was meticulous, and aggressive, in accomplishing his agenda, such as with obtaining credit for his previous classes. The Plaintiff acknowledged that he earned a higher grade point average during 1999 and 2000, notwithstanding his panic attacks and anxiety, than he had when he attended UWS from 1968 to1972, when he did not suffer from those conditions.

25. Schwallie became involved in the Plaintiff's claim, in 1999 and 2000. Schwallie graduated from the University of Wisconsin-Green Bay ("UWGB"), in 1973, with a degree in social work, and he has taken continuing education credits to maintain his social worker's license, which required between twenty and thirty-two credits every two years. Schwallie usually focused his continuing education credits in subjects

related to psychiatry, such as depression and anxiety, and he has recently taken seminars on bipolar problems. While in school at UWGB, Schwallie worked as a psychiatric technician, for two to three years, he later worked at a group home in Racine, Wisconsin, for the developmentally disabled, for one year, and he also worked at the Milwaukee Psychiatric Hospital for two years. Schwallie became a discharge planner at the Milwaukee hospital, where he worked until 1996. In that capacity, Schwallie developed outpatient plans to maintain the patients' stability, and he had to be familiar with illnesses and treatment modalities. He evaluated hundreds of patients' functioning abilities. Schwallie began working for the Defendant in August of 1996, and became a senior disability benefits specialist, with specific reference to psychiatric claims, which he would evaluate for partial or total disability. Over time, he became the disability benefits claims consultant, in which position he handled fewer case files, so as to allow for attention to specific problems, such as the Plaintiff's. In 2000, Schwallie was made the lead disability benefits consultant, and he currently handles no case load, but rather, he addresses appeals, obtains all referrals, and he manages controversial claims. In addition, he is constantly assessing mental illness, by reviewing the medical records of the insureds, their treatment, and their level of

functioning. However, Schwallie acknowledged that he is neither a vocational rehabilitation specialist, nor a doctor.

26. Schwallie became involved with the Plaintiff's claim in December of 1999, or early January of 2000, after the Plaintiff had made allegations against Janet Zwifelhofer ("Zwifelhofer"), who was the claims analyst assigned to the Plaintiff's claim. Since Schwallie was the disability benefits consultant, Zwifelhofer referred the Plaintiff's claim to him, and he reviewed the entire claim file, but he did not find any merit to the Plaintiff's complaints. Schwallie wrote to the Plaintiff on January 12, 2000, see Exhibit 35, informing him that, although he was concerned about the Plaintiff's claims, Zwifelhofer had handled the claim within the guidelines, and had not done anything wrong. Thereafter, Schwallie took over the Plaintiff's claims, because the letter did not assuage the Plaintiff's concerns.

27. From January of 1999, or earlier, through at least August of 2000, the Plaintiff engaged in an ongoing written discussion with the Defendant, and he began writing lengthy letters to the Defendant, in which he summarized his analysis of the policy, outlined his position as to the Defendant's practices, and he assembled facts and documents, which he submitted along with his letters. See, Exhibits 31-39, 42-43, 46-52. Schwallie characterized the tenor and tone of the Plaintiff's letters as

accusatory, acrimonious, and angry, but he stated that they were focused, and well thought out, and that they reminded him of letters sent by attorneys. In his letter of March 16, 2000, the Plaintiff also copied the letter to the Departments of Commerce, in both Minnesota and Wisconsin, in which he registered complaints against the Defendant. He detailed his psychological illnesses, his treatment, and his school work, and he specifically stated that he was very busy in school, that he attended meetings, guest lectures, and seminars, and that he did what every normal student did. See, Exhibit 38. The Plaintiff's complaints were forwarded to the Florida Department of Insurance, which responded by sending a letter to the Plaintiff, informing him that he had not abided by the contractual provisions of the policy. See, Exhibit 45, and 53.

28. In January of 2000, Dr. Egan noted that the Plaintiff had been doing well in school, that he was exercising hard in order to lose weight, that he had only experienced rare panic attacks, and that he was doing well, with the exception of a sleep disturbance. See, Exhibit 3. All of those notations were based on the Plaintiff's self-report. Upon conducting a mental status examination, Dr. Egan noted that the Plaintiff was alert, cooperative, and oriented in all spheres, which was essentially the same every time that Dr. Egan examined the Plaintiff. The Plaintiff's mood was euthymic, or normal, which would not qualify as a major depressive disorder under the

Diagnostic and Statistical Manual of Mental Disorders - IV ("DSM-IV"). Additionally, the Plaintiff had a full affect, which meant that he had a normal range of emotional expressions. Dr. Egan further found that the Plaintiff's speech was normal; that his thought processes were logical, goal-oriented, and without evidence of disorder; that there was no evidence of delusions or hallucinations; that his immediate recall, recent memory, and remote memory were intact; and that his insight and judgment were intact. Dr. Egan testified that those findings were consistent throughout virtually every examination of the Plaintiff. With regard to the Plaintiff's concentration and memory, Dr. Egan opined that the Plaintiff might have claimed to have difficulty in those areas, because a lot of people with depressive disorders have a subjective sense of memory and concentration disturbance that does not often bear out in psychological testing, or in a mental status examination. Finally, Dr. Egan reported that the Plaintiff's panic disorder was in full remission, as of that date. Id.

29. On February 4, 2000, the Plaintiff saw Schwartz, who noted that he looked healthy and alert, and that he was enthusiastic about school. See, Exhibit 3. She also stated that he had established healthy friendships, that he had been working on his house with a friend, and that he was enthused about settling in. Id. Schwartz concluded that the Plaintiff was less depressed, and more positive about the future. Id. Dr. Egan testified that those

notations suggested that the Plaintiff had considerable interest in a wide variety of areas, which was contrary to the DSM-IV diagnosis of major depressive disorder. Later that same month, Schwartz recorded that the Plaintiff appeared animated, and that he was "obviously experiencing an improved mood." Id. The Plaintiff was becoming involved in the Ambassador's Club, and Dr. Egan agreed that social involvement was an indicator of normal, as opposed to depressed behavior. When Dr. Egan saw the Plaintiff in March of 2000, the Plaintiff exhibited minimal neurovegetative signs of depression, such as sleep and appetite disturbance, or problems with concentration and memory, and Dr. Egan testified that he had improved. Id.

30. In February of 2000, the Plaintiff wrote a memorandum to Cuzzo, in which he thanked her for an appraisal that she had given him concerning an oral presentation. See, Exhibit 19. He characterized her comments as constructive, and he thought that they would give him things to work on in "real life." Id. During the same month, Cuzzo received a letter from the Plaintiff, in which he requested that she write a letter concerning his disability, and he provided her with Schwallie's name and address. See, Exhibit 41. The Plaintiff met with Cuzzo in her office, and informed her that he had made a claim for disability, and that he needed a letter of support from her

to his insurance company, in order to help him succeed with his disability claim. As to the Plaintiff's letter, Cuzzo listed the four points on which he wanted her to comment -- namely, the legitimacy of his program of study, his progress in the program toward his degree, the effects of his medication, and his sincerity in completing the program. Id. In Cuzzo's letter[31] to Schwallie, which is dated April 5, 2000, she based her statements on the Plaintiff's self-reports, and on her personal observations of him. She related that the Plaintiff experienced problems with travel, and discussed his driving ability, but she had never been in his car, at her choosing. Cuzzo's comments about the Plaintiff's driving ability were based on his self-reports of just being able to maintain his concentration, while driving, although he had lost it a couple of times, and his statement to her that he was afraid to drive to the Twin Cities, because it was too far. She further informed Schwallie that she had observed improvement in the Plaintiff's participation in the program, and that the Plaintiff showed interest, and was predicted to complete the program on a timely basis. Cuzzo acknowledged that she had no basis upon which to form an opinion as to whether the

[31]The letter was not introduced as an Exhibit at Trial, but it is Exhibit 31, to her Deposition. We relate the content of the letter, only insofar as it was the subject of testimony at Trial, without objection.

Plaintiff was disabled under the insurance policy, that she had no psychological, or vocational rehabilitation training, that she did not know what medications the Plaintiff was taking, and that she had no frame of reference as to what the Plaintiff was like on, or off, his medications.

31. The Plaintiff received credit for three independent study courses -- one in the Spring of 2000, and two in the Fall of 2000 -- and he received "A" grades in all three. In the Spring of 2000, the Plaintiff enrolled in an independent study course, as a part of an internship project, which was headed by Chris, who was another student at UWS. Since Chris had arranged the project with Cuzzo, the Plaintiff could not say how it was graded, but even though five or six students were involved, he thought that only he and Chris received credit for the course. According to the Plaintiff, Chris was primarily interested in having the Plaintiff review the paper presentation, rather than attending any of the sessions, but the Plaintiff participated in six to eight of the presentations, at schools in Minnesota and Wisconsin, and his role was as the "closer." During the presentations, which were designed to encourage students to attend UWS for the paralegal field of study, he would lecture the class about his experience as a paralegal, and he was able to complete those presentations, without suffering any panic attacks. The Plaintiff acknowledged that, by making the

presentations, he was performing tasks similar to those he had performed as a paralegal.

32. The Plaintiff traveled to Europe in the Spring of 2000. Prior to that time, Boyd Dalos ("Dalos")[phonetic], at LSC, had spoken about an earlier trip but, by the time he had mentioned it, the trip was already full. However, the Plaintiff decided to go on a later trip, contacted Dalos, and informed him of his mental health problems, and medications. Dalos agreed that the Plaintiff could travel with them, and he explained that he had some prior experience counseling Vietnam Veterans, which might help the Plaintiff to avoid panic attacks, by speaking with someone. The trip, which was approximately two weeks long, with five days in London, England, and another five or six days in Ireland, went well, and the Plaintiff was interested in seeing the sights that he had read about in books. While on the trip to Europe, he met a woman, who he started to date.[32]

33. At the Defendant's request, the Plaintiff was seen by Dr. Paul A. Arbisi ("Arbisi"), in June of 2000. See, Exhibit 4. Dr. Arbisi is a clinical psychologist, who

[32]Dr. Egan testified that the Plaintiff's interest in travel was contrary to someone suffering from depression, and contrary to someone suffering from a panic disorder, except that a person whose panic disorder was under good control, would be more likely to want to do social things.

is employed full-time at the Minneapolis VA Medical Center. See, Exhibit 5. Dr. Arbisi has confronted anxiety and panic disorders, as well as depression, for his entire career, and he has treated over one thousand patients with those disorders.[33] Although he has conducted IMEs for the Defendant in the past, his opinions are not influenced by his other work for the Defendant.[34] Dr. Arbisi received a telephone call in the Fall of 1999, in which the Defendant requested that he provide an objective, independent opinion, as to the Plaintiff's emotional state. However, the IME was difficult to schedule, because the Plaintiff was reluctant to be seen in Minneapolis, and he repeatedly complained about the scheduling of the IME. See, Exhibits 32-34, 36, 38, and 43. Eventually, Dr. Arbisi was asked if he was willing to travel to Duluth to perform the IME, which he did. To do so, he sublet space in a mental health clinic,

[33]Dr. Arbisi testified extensively about his credentials and, rather than reciting the details here, we simply reference his full curriculum vitae. See, Exhibit 5.

[34]Schwallie testified that he has spoken with Dr. Arbisi, but that he only knows him through telephone conversations. The Defendant relied on Dr. Logan, who is their in-house psychiatric consultant, to make recommendations as to physicians who could perform IMEs. In the Plaintiff's case, Dr. Logan had spoken with Dr. Egan and, upon consulting with Schwallie, the decision was made to seek an IME, which was requested in September or October of 1999. Schwallie eventually made the decision to terminate the Plaintiff's benefits, based on the report of Dr. Paul Arbisi ("Arbisi"), and the opinions of Dr. Logan, who reviewed, and agreed with Dr. Arbisi's report, as well as the contents of the Plaintiff's entire claims file.

and conducted the IME over the course of two days, from June 7 to June 8, 2000. In preparation for the interview, Dr. Arbisi reviewed the Plaintiff's medical records, and claims file, so he had information regarding his diagnosis and treatment, by both Dr. Egan and Schwartz, and he also had the letters that the Plaintiff had written to the Defendant. Following the IME, Dr. Arbisi also had the opportunity to review the Plaintiff's school records, which he considered in rendering his opinion, as well as the deposition testimony of the Plaintiff, Cuzzo, and Dr. Egan, which did not alter his opinions.[35]

34. Dr. Arbisi's methodology included a clinical interview, a mental status examination, and the administration of tests -- namely, the MMPI-II, the Beck Depression Inventory, and a cognitive memory test. On June 7, 2000, Dr. Arbisi spent seven to eight hours with the Plaintiff, during which time, he interviewed him, administered certain psychological instruments, and completed some administrative tasks. Dr. Arbisi's interview of the Plaintiff lasted approximately two hours, during which, Dr. Arbisi obtained the Plaintiff's history, and discussed a variety of subjects,

---

[35]Dr. Arbisi confirmed that he was not a medical doctor, and that he had never treated the Plaintiff. He further testified that his hourly fee, for Trial, is $420.00 per hour, and that the total amount he had received for his work on the Plaintiff's case was approximately $10,000.00, although he had not calculated the exact sum.

including the Plaintiff's perception of his termination from the law firm in Florida, his hospitalization in 1998, his experiences in school, his trip to Ireland, and his symptoms, all the while observing the Plaintiff's behavior.[36] According to the Plaintiff, he reported his panic attacks, and the side effects from his medications, which included nausea, fatigue, dizziness, and difficulty concentrating, and he told Dr. Arbisi that, following the course of Xanax, his depressions was problematic. The Plaintiff also complained of fatigue, dysphoria,[37] poor motivation and concentration, lapses in

[36]In his report, Dr. Arbisi noted that the Plaintiff "enthusiastically discussed" his recent trip to Ireland and England, and that, during the trip, the Plaintiff did not feel uncomfortable, except on one occasion when he became lost in London, but the Plaintiff specifically denied having a panic attack, and stated that he was able to reorient himself, and return to his hotel. See, Exhibit 4. The Plaintiff also reported that he planned to set up a private mediation firm in the Duluth/Superior area, and he was remodeling his home, to accommodate an office. Id. The Plaintiff stated that he worked out on a daily basis, for one to one and one-half hours, he played golf several times per week, he saw friends socially a couple of times per week, and he had begun dating a woman, who he met on his trip to Ireland. Id. Finally, the Plaintiff was unable to specify what prevented him from returning to work, and he attempted to change the subject when the issue was broached, but he stated that he did not foresee any impediment to starting his mediation business, once he had completed his classes. Id.

[37]Dr. Arbisi testified that dysphoria is a feeling of unhappiness, but it is not the same as depression.

memory, anxiety, and tension. The Plaintiff also told Dr. Arbisi that he was a "scratch player," and that he hit golf balls.[38]

35. With regard to the Plaintiff's mental status, Dr. Arbisi found that the Plaintiff did not meet the criteria for a major depressive disorder, which required a finding of a depressed mood that lasted almost all day for two weeks or longer, or a loss of interest and pleasure in all things. The Plaintiff did not satisfy those requirements, and the medical records coincided with that determination. The Plaintiff was oriented and alert, he was quite engaging, he could speak clearly and logically, he had a full affect, and his mood was euthymic, which means normal. Dr. Arbisi did not observe any evidence of depression or anxiety, and the Plaintiff reported that he was feeling "pretty good." The Plaintiff had just returned from a trip to Ireland, where he had met a woman and, when Dr. Arbisi inquired about his libido, the Plaintiff stated that it was returning, and that he was more interested in women, which Dr. Arbisi found significant, because one of the hallmarks of depression is a lack of interest, or

[38]The Plaintiff had purchased a pass at the Poplar golf course, in 1999, and he won a trophy in the third flight of five flights, in match play. In 2000, he did not have time to golf, between traveling to Europe, and taking classes, but he purchased a pass from the golf pro at the Nemadji golf course, who sold it to him at a substantial discount.

pleasure, and a seriously depressed individual did not find sexual activity pleasurable. The Plaintiff reported difficulty concentrating, but Dr. Arbisi found that his memory and ability to concentrate were normal. Dr. Arbisi explained that, occasionally, people subjectively believe that their concentration is not good, and hold to that view, despite a lack of objective evidence, and he recalled that the treatment notes of both Dr. Egan, and Schwartz, mentioned subjective complaints, which were not objectively corroborated, and they noted that he was functioning fairly well.

36. Dr. Arbisi administered the MMPI-II, which is a 567-item true or false instrument, that is designed to render an objective estimate of the psychopathology, and the presence, or absence, of symptoms, based on empirical data in comparison with other individuals. The Plaintiff completed the examination, and Dr. Arbisi found that his results were consistent with individuals who are somatically preoccupied with their health, and are unhappy to some degree, but who are not clinically depressed. Dr. Arbisi explained that, when the Plaintiff was emotionally upset, he would focus on his physical problems. The Beck Depression Inventory is a self-report of depression, which the Plaintiff completed by circling items that best fit him. Dr. Arbisi concluded that the Plaintiff sees himself as depressed, and he responded in a way that is similar to those who are depressed, and who have major depressive disorder. However, the

results were not consistent with the Plaintiff's activities, the MMPI-II, his mental status examination, or the medical records from the previous eight months. The final test of the first day was the Wechsler Adult Intelligence Scale III ("WAIS-III"). The Plaintiff was able to complete the WAIS-III, and his overall intelligence fell in the average range. The Plaintiff performed less well on tests of spatial, perceptual, and non-verbal skills, but his verbal skills, and verbal memory, were in the average range, as was the Plaintiff's working memory index, which required sustained attention, and concentration.

37. On the second day, Dr. Arbisi administered another test -- namely, the Wechsler Memory Scale III ("WMS-III"), which objectively measures an individual's short-term, non-verbal, and verbal form memory. Although the Plaintiff completed the test, Dr. Arbisi felt that he was less invested on the second day, and that he was not putting forth a full effort.[39] Since the test-taker can alter the results of the examination, Dr. Arbisi was required to consider the results in the context of the full record. The Plaintiff's results on the WMS-III were more scattered than they had been on the

[39]The Plaintiff testified that he cooperated with Dr. Arbisi to the best of his ability, although he had some difficulty on the second day, and in particular, with the visualization exercises.

WAIS-III and, although he performed in the average range on the verbal portions of the test, he did not perform well on tests which involved geometric figures. Dr. Arbisi thought that the Plaintiff's difficulty in spatial material could be a result of a focal right hemisphere dysfunction, and he suggested that a further assessment be completed to determine whether the Plaintiff's poor performance was attributable to a lack of motivation, or to organic changes, which were localized to the right hemisphere. The IME was completed around 1:00 o'clock p.m.

38. Dr. Arbisi opined, to a reasonable degree of psychological certainty, and in accordance with the DSM-IV, that the Plaintiff's major depressive disorder was in remission, which meant that he had recovered from the condition, as of June of 2000, or to put it another way, that he had not had any significant signs or symptoms of major depression, within the prior two months. However, Dr. Arbisi agreed that the absence of symptoms did not predict whether the condition would remain in remission in the future. The Plaintiff denied depression, or a feeling of disinterest, over the two weeks prior to the IME and, in fact, the Plaintiff's reports demonstrated the exact opposite. The Plaintiff was taking a prescription for Trazodone,[40] and was sleeping

[40]Trazodone is "an antidepressant used to treat major depressive episodes with (continued...)

well, he expressed interest and pleasure in activities, particularly his trip to Ireland, he was excited about starting a mediation business from his home, and he was interested, and was doing well in school. The sine qua nons of depression are a depressed mood, or a loss of interest, and the Plaintiff did not have either of them.[41] Therefore, Dr. Arbisi concluded that the Plaintiff was not depressed. Although Dr. Arbisi diagnosed a panic disorder, without agoraphobia, by history, which meant that it was based on the Plaintiff's charts,[42] he further opined, to a reasonable degree of

---

[40](...continued)
or without prominent anxiety." Dorland's Illustrated Medical Dictionary, at 1868 (29th Ed. 2000).

[41]Dr. Egan similarly testified that the two essential criteria for major depressive disorder, as identified by the DSM-IV, are a persistently depressed mood, or an inability to experience interest or pleasure in all, or almost all activities, for a period of two weeks or longer. He further stated that the DSM-IV notes that a loss of interest is almost always present with a person suffering from major depressive disorder, and that four other symptoms, or criteria, are also required to be present. The DSM-IV also states that, in the majority of cases, there is complete remission, which means that the symptoms disappear, and functioning returns to the premorbid level, which means that the individual is able to function as well as they did before the depression began. Dr. Egan testified that he relied on the DSM-IV in reaching his diagnosis of major depressive disorder, and the criteria that he found are listed on the chart from his first visit with the Plaintiff, on May 20, 1998, as we have previously detailed. See, Exhibit 3.

[42]Dr. Arbisi testified that the diagnosis had been made by apparently competent examiners, and there was no way of knowing whether the diagnosis was erroneous, but (continued...)

psychological certainty, that the Plaintiff did not meet the diagnostic criteria for a panic disorder.[43] The Plaintiff had not experienced any panic symptoms since at least September of 1999, which roughly coincided with the dispute, in Mock Trial, and Dr. Arbisi was unsure whether that "problematic encounter" even constituted a panic attack. Dr. Arbisi diligently probed the Plaintiff about the issue of panic attacks, and the fact that Europe had been a new environment, but the Plaintiff stated that, although he had become lost in England, he did not have a panic attack. Therefore, Dr. Arbisi concluded that the Plaintiff was not suffering from a panic disorder in June of 2000.[44]

[42](...continued)
he did not find the presence of all of the symptoms for a panic disorder, as listed in the DSM-IV.

[43]Dr. Egan also relied on the DSM-IV, in conjunction with the Plaintiff's reports of chest pain, shortness of breath, numbness and tingling in his extremities, an intense sense of panic and anxiety, and a desire to flee the area, in diagnosing the Plaintiff with a panic disorder. With regard to both diagnoses, Dr. Egan testified that the Plaintiff had received both medication management, and psychotherapy, prior to treating with Dr. Egan, which was apparently successful, in that he was functioning at his premorbid level, and had returned to work as a paralegal, which he continued to do for three years, until he was fired by his employer.

[44]Dr. Arbisi also diagnosed the Plaintiff with a personality disorder, not otherwise specified, with narcissistic and dependent traits. He clarified that the diagnosis meant that the Plaintiff did not meet the criteria for a specific personality disorder, but that it caused significant impairment in one or more areas of functioning. Dr. Arbisi based his finding on the Plaintiff's history of interpersonal differences with
(continued...)

39. Dr. Arbisi testified that his conclusions were consistent with the Plaintiff's treatment records. One month before the IME, Schwartz had decided to decrease the frequency of the Plaintiff's treatments, and she subsequently stopped treatment, because she felt that it was no longer needed for his conditions. Further, in the early part of the year 2000, Dr. Egan wrote, in his treatment notes, that the Plaintiff's mood was euthymic, that he was doing well in school, and that the Plaintiff's panic disorder was in full remission. Finally, Dr. Arbisi stated that the Plaintiff's treatment is not consistent with the guidelines set forth by the American Psychological Association ("APA"), because he has not been involved in cognitive behavioral treatment,[45] and

---

[44](...continued)
others, such as the people at his former law firm, his sister, and his Mock Trial teammates. However, Dr. Arbisi stated that the Plaintiff's personality disorder was not disabling, in terms of his ability to perform, but rather, that some of his unhappiness was attributable to that, because it impaired his ability to have close relationships with others. Dr. Arbisi opined that the condition had been present for many years, and probably for most of the Plaintiff's life, including when he was working full-time without disability, and that it has not, and would not, affect his ability to perform the principal duties of his occupation.

[45]Dr. Egan also testified that the APA guidelines recommend a combination of medication and psychotherapy, for moderate to severe depression because, while they are independently useful treatment methods, they are more effective together. Specifically, the guidelines recommend cognitive behavioral therapy, which is based on the theory that people can be taught to control their behavior, in response to various circumstances, and that depression and moods are secondary to negative
(continued...)

because Schwartz's decision to limit the Plaintiff's psychotherapy was consistent with a finding that the Plaintiff's condition did not warrant therapy. Dr. Arbisi testified, as did Schwallie and Dr. Egan, that there is a difference between sickness and disability, and that one can be sick, and suffer from a condition such as major depression or panic disorder, without being disabled. Dr. Arbisi further testified that fourteen percent of the population suffers from depression, but remains productive, with which Dr. Egan agreed.[46] According to the DSM-IV, major depression often waxes and

[45](...continued)
thinking, which can be retrained.

The guidelines also place patients in various phases, from an acute phase to a continuation phase, and then to a maintenance phase. Dr. Egan testified that the Plaintiff had probably been in a maintenance phase, since at least September of 2000, when his psychotherapy had been terminated, with some exacerbations from time to time.

[46]Dr. Egan also testified that it was very common for a person to suffer from depression, and panic disorder, and yet still be able to work, and that the Plaintiff was a prime example of that from 1994 to at least 1997, when he suffered from those disorders, but was able to work full-time, as a paralegal. When the Defendant discussed the testimony from the Plaintiff and Cuzzo, about his school work, and its similarity to the principal duties of a paralegal, Dr. Egan stated that he had no reason to dispute that testimony, but he had to disqualify himself from answering whether the Plaintiff could have performed the principal duties of a paralegal, during his schooling at UWS.

wanes, it can be well-controlled with appropriate treatment, and will often disappear within a year or two.

40. Dr. Arbisi further stated that he inquired as to the Plaintiff's duties as a paralegal, and that he had reviewed documents from the claims file that described his duties. From the Plaintiff's ability to achieve "A" grades in subjects, which involved activities similar to those of a paralegal, Dr. Arbisi opined that the Plaintiff was able to perform the duties of a paralegal, in June of 2000. Furthermore, upon psychometric examination, the Plaintiff's concentration and verbal skills were all in the average range, which yielded a similar conclusion. The Plaintiff's school work suggested that the Plaintiff was invested in performing well, and that he could sustain attention and motivation, which was inconsistent with individuals who are depressed. Dr. Arbisi has performed studies with students who suffer from major depression, and has observed a significant detriment in grades, and he stated that an individual with major depression would not care whether he received "A" grades. Even if the Plaintiff had been attending school part-time, his grades demonstrated his ability to focus, and perform at quite a high level. Dr. Arbisi was hard-pressed to find an area of functioning, in which the Plaintiff was not doing well, because he attained straight "A"s, he had a girlfriend, he socialized with friends during the week, he was working out, and he was

golfing. In short, the Plaintiff's activities were indicative of normal functioning, and were similar to what he was doing, prior to the onset of his disability.

41. With regard to Dr. Arbisi's mention of secondary gain, or malingering, which he described as a tangible benefit for feigning illness, sickness, and disability, he testified that there is always some secondary gain to a disability, because a benefit would follow. In the Plaintiff's case, Dr. Arbisi was uncertain whether the Plaintiff was consciously exaggerating his disability, but there was a discrepancy between what he does, which is an objective measure, and what he states, which is a subjective measure. When Dr. Arbisi asked the Plaintiff why he could not return to work, or become a mediator, he responded that he had to finish school, and set up a business, which suggested that the Plaintiff's secondary gain was obtaining benefits, so that he could finish school.[47]

42. While Schwallie stated that the entire contents of Dr. Arbisi's report were important, he found Dr. Arbisi's conclusion, that the Plaintiff's depression, and panic disorder were in remission, to be particularly significant. Since, in Schwallie's

[47]Dr. Egan similarly defined secondary gain as some additional benefit that a person might get from either psychological or physical symptoms that place the person in a "sick role," but he stated that secondary gain was not present with the Plaintiff.

experience, individuals who suffer from major depression and panic disorder, are fairly reclusive, and are not active, he noted the Plaintiff's school, and other activities, and, in his view, as well as that of Dr. Logan, the Plaintiff's disorders were not as severe as they were originally assessed to be. Further, Dr. Arbisi's concern about the Plaintiff's possible motivation for secondary gain were of concern to Schwallie, and Dr. Logan, but that did not dictate the claim decision. Schwallie referred Dr. Arbisi's findings to Dr. Logan, who agreed with the stated diagnosis, as well as the conclusion that the Plaintiff's signs, and symptoms, did not substantiate the claimed limitations. Dr. Logan wrote that Dr. Egan had previously agreed that there was no objectively validated evidence of an impairment, that the Plaintiff's prognosis was good, and that an IME, and psychological testing, would be advantageous. See, Exhibit 2, at 1004-1005. Schwallie relied upon Dr. Logan's assessment, as well as the Plaintiff's academic records, and letters to the Defendant, which were significant because they revealed that the Plaintiff could maintain a high grade level in course work that was similar to the work of a paralegal, and the letters also revealed the utilization of skills as a paralegal. In Schwallie's view, the Plaintiff's condition was abating, which was consistent with the treatment of the illness, and he stated that many individuals return

to their normal level of functioning, because the conditions respond very well to appropriate medications, and therapy.[48]

43. On August 11, 2000, Schwallie notified the Plaintiff, by letter, that his benefits were terminated, because he no longer suffered from a sickness, and because he was not disabled within the meaning of the policy.[49] See, Exhibit 55. In addition, Schwallie notified the Plaintiff that, because the Defendant had been paying benefits on an accommodation basis, since March of 2000, it appeared that there may have

[48]On July 7, 2000, Schwartz noted that the Plaintiff was euthymic and, in an inflated and expansive mood, that he had been talking about his trip to Ireland, and his new romantic relationship, and that his depressive symptoms had abated. See, Exhibit 3. Dr. Egan testified that Schwartz's notations suggested that the Plaintiff had improved. However, on July 18, 2000, Schwartz noted the Plaintiff's complaints of increased depression, diarrhea, and fatigue, which were similar to his earlier complaints, and which are consistent with depression, and anxiety. Id. Also, in July of 2000, Dr. Egan completed an attending physicians' statement -- similar to others that he had completed in the past -- in which he stated that the Plaintiff was incapable of finding work in another occupation. See, Exhibit 26. Dr. Egan's diagnosis of the Plaintiff had not changed, at that time.

[49]Dr. Egan testified that the best reference to the Plaintiff's condition in August of 2000, would be the medical records prepared by himself, and the psychotherapists. As of August 15, 2000, Schwartz's treatment records state that the Plaintiff was progressing well in school, which had boosted his self-esteem. See, Exhibit 3. Schwartz also noted that the Plaintiff had plans for the future, which Dr. Egan testified was contrary to the actions of a depressed person, and that he had made a great deal of progress. Id. The Defendant had Dr. Egan testify about several of the Plaintiff's other medical records, from January of 2000, through February of 2003, which we have addressed elsewhere, in our Findings of Fact.

been an overpayment of benefits.[50] See, Exhibit 55. Although Schwallie informed the Plaintiff that he could submit additional information regarding his claim, the Plaintiff chose to send only a two-sentence letter, in which he stated "I just received your letter of August 11, 2000 and your company continues its policy of bad faith," and "I demand that you immediately reinstate payments to me." See, Exhibits 55 and 56. Schwallie again invited the Plaintiff to submit additional information, but the Plaintiff chose not to do so. See, Exhibit 57. The Plaintiff's policy contained a provision, which waived the premium benefits from the time that his disability claim was approved, until the time that it was terminated, and when his benefits were terminated, Schwallie notified the Plaintiff that his premium billing would resume on August 16, 2000, see Exhibit 55, but the Plaintiff did not pay any premiums after that date. Since the Plaintiff did not pay any premiums after August of 2000, see Exhibit 58, his policy lapsed out of force, in accordance with the terms of his policy. See, Exhibit 1. Following the Plaintiff's termination of benefits, the Defendant did not send him any more monthly forms, or monthly physician statements.[51]

[50]However, the Defendant has not taken any means of collecting the overpayment of benefits, and does not seek any such relief in this litigation.

[51]The Plaintiff's last attending physicians' statement, and his last request for (continued...)

44. Schwallie explained that, from February of 1998, through August of 2000, the Plaintiff received a base monthly benefit of $2,396.00, and an additional $200.00 per month, which was a future index benefit ("FIB") that the Plaintiff purchased along with his policy in 1991, and which is calculated on a consumer price index, using the Department of Labor statistics.[52] See, Exhibit 59. Therefore, during the Plaintiff's period of disability, he received a total of $5,806.67 in FIB, and another $69,563.86 in total monthly benefits. Id. After August 16, 1999, which was the anniversary of the Plaintiff's policy, following the beginning of his disability, the Plaintiff's total payment of $2,596.00 per month would not, and should not, have increased, because the policy did not allow for increases while premiums were being waived -- for example, where, as here, the Plaintiff's premiums were waived because he was receiving disability benefits. The full benefit is determined at the time the disability occurs, and does not increase thereafter.[53] Accordingly, if we were to find that the Plaintiff was entitled to

---

[51](...continued)
continuance of benefits, were dated July of 2000. See, Exhibits 26, and 27.

[52]The Plaintiff's policy allows a minimum increase of four percent, and a maximum increase of eight percent, and the formula for calculation is set forth in the policy. See, Exhibit 1.

[53]Schwallie also testified as to the benefits that would accrue to the Plaintiff, if
(continued...)

full benefits, we could calculate the amount owed by multiplying $2,596.00, by the number of months that have passed since August of 2000. Under the terms of his insurance policy, the Plaintiff could potentially receive benefits until he is sixty-five years old and, if the Plaintiff were working full-time at that time, there is a renewability clause, which occurs separately from Schwallie's department.[54]

[53](...continued)
he were partially disabled. The Defendant objected as to relevance, and argued that the Plaintiff had only claimed total, as opposed to partial, disability. We permitted Schwallie to testify as to partial disability benefits, but we noted that we would later determine whether to consider it. As we express in our Conclusions of Law, and Memorandum, we find that the Plaintiff has not made a claim for partial disability, and any such testimony is irrelevant. Although we have not further considered the testimony in rendering our decision, we recite Schwallie's testimony on the subject in the interests of completeness. Schwallie testified that, in the first six months of partial disability, a claimant could elect to receive either fifty percent of the full benefit, or a calculated benefit but, to meet the requirements of a partial disability, a claimant would need to have at least a twenty percent loss of time, or earnings. See, Exhibit 1. With regard to the calculated benefit, a claimant can select the average monthly earnings of either twelve of twenty-four months, or the best of two of five years, before the start of disability. Id. Accordingly, the Plaintiff could have received fifty percent of his full benefit or, since he had no earnings, he could have received the entire amount of the full benefit, had he elected that option in the first six months.

[54]On cross-examination, Schwallie testified that he had participated in the defense of the case, and he had reviewed the Answer, and prepared answers to the Plaintiff's Interrogatories. In its Answer, the Defendant raised an affirmative defense, in which it claimed that the Plaintiff was neither totally nor partially disabled, and in response to the Interrogatories, he was asked to set forth all of the facts that demonstrated that the Plaintiff was neither partially, nor totally disabled.

45. At UWS, in the Fall of 2000, the Plaintiff received credit for his participation in Mock Trial,[55] which required him to review Affidavits, and evidence in a case, develop a case strategy, outline witness testimony, and present the case. The Mock Trial program did not require any tests but, instead, the students were graded on the scrimmages, and their performance. Initially, there were at least two teams and, because one of the teams was comprised primarily of students who were close friends, and who had previously participated in Mock Trial, the Plaintiff elected to join the second team. He became a witness, rather than an attorney, because he felt that his best asset would be in helping the other students, who were interested in becoming lawyers. As part of the program, he had to analyze and review documents and evidence, prepare memoranda concerning trial strategy, prepare witnesses, create outlines for questioning witnesses, and prepare for Trial, which was similar to his work as a paralegal. When some of the witnesses from one of the teams quit, the two teams

[55]There is some discrepancy about when the Plaintiff participated in Mock Trial. Although his school transcript indicates that he received credit for it in the Fall of 2000, and Cuzzo testified, while looking at the transcript, that he took the course at that time, the Plaintiff mentioned the conflicts in Mock Trial to Schwartz, in December of 1999, and to Dr. Arbisi, in June of 2000, which suggests that he actually took the course in the Fall of 1999. The actual time line is irrelevant to our decision and, for ease of reference, we include the pertinent testimony, in the Fall of 2000, in accordance with when he received the credit for the class.

were combined. The Mock Trial team involved a very intense group of students, whose interpersonal dynamics deteriorated, resulting in a lot of fights, shouting, and name-calling, both by the Plaintiff as well as by other students. The Mock Trial team canceled their participation in the Regional competition, for the first time. As a result of the conflicts within the program, the Plaintiff suffered a panic attack, and other near panic attacks, which he resisted. The Plaintiff was an active participant in the program, until the team imploded, and he received an "A."

46. The Plaintiff's fellowship with Cuzzo also began in the Fall of 2000, and he was given specific assignments, in light of his background. The fellowship, which is open for an entire academic year, is an award of $2,000.00, offered by the Provost, which Cuzzo divided among several students.[56] During his fellowship, the Plaintiff worked on three separate projects, which included: 1) assessing whether UWS should seek approval from the ABA for its paralegal program; 2) researching the Paralegal Advanced Competency Exam ("PACE"), and determining whether UWS should be

[56]The Plaintiff was to receive $400.00 in compensation for his work. However, he billed the Provost's Office $800.00, and Cuzzo "had to make the case to get payment."

teaching to that program; and 3) setting up internships.[57] The Plaintiff researched the ABA approval process, by accessing the ABA's website, and downloading information, after which he completed an analysis of whether UWS's paralegal program could meet those requirements in light of the available resources. The Plaintiff submitted a memoranda to Cuzzo, see Exhibit 14, which was a cogent analysis of the "pros and cons" of obtaining ABA approval, and he demonstrated a high degree of aptitude, which went well beyond what Cuzzo would have expected of a student. UWS found that the Plaintiff's recommendations were consistent with third-party analyses and, although there were other criteria, UWS followed his recommendation, which underscored the validity of the Plaintiff's analysis. With regard to the PACE project, the Plaintiff had to perform research on the Internet, analyze the PACE requirements, such as cost and content for national testing, and prepare a one page report, so that he could recommend library acquisitions for the national testing. He drafted a letter to paralegal students, as well as a letter on the WITC program, which Cuzzo found satisfactory and useful, and to which she made

[57]Around that time, the Plaintiff entered a relationship with Maupins, who he had met because she was the president of the Duluth Chapter of paralegals, and she had local information on paralegals.

no changes. See, Exhibit 16. Finally, in setting up the internships, the Plaintiff prepared a survey, see Exhibit 13,[58] which he sent to area law firms, and government agencies, in order to collect information as to whether those organizations were interested in having interns work in their offices. Cuzzo thought that the survey, to which she did not make any changes, was well done, and that the Plaintiff did superior work. The tasks of background research, analysis, writing, contacts, and interviews, that were required in the project, were similar to those performed by paralegals, and his work was of a high quality, and met with Cuzzo's satisfaction, although it was delayed slightly.[59] In analyzing the Plaintiff's fellowship work, as a whole, Cuzzo testified that it represented a facet of the work that a paralegal might be required to do -- namely, conducting Internet research, analysis, and a survey -- and that the

[58]The survey, which contains a list of paralegal duties, was prepared by the Plaintiff based on his own experience, and information obtained through his work on the ABA and PACE programs. He stated that the list included items that he performed in his work as a paralegal, as well as items that he did not do.

[59]Cuzzo described one problem with the Plaintiff's contacts with the City of Superior, in which the style and content of his e-mail had offended the contact person, who then called Cuzzo. Apparently, Carol Ahlberg ("Ahlberg"), who was the City's contact person, e-mailed the Plaintiff, and complained that he was asking for so much detail, that it would take the City a long time to comply, which showed that the Plaintiff was being very thorough. At a meeting, in which Cuzzo, Ahlberg, and the Plaintiff participated, the demands were simplified, and the problem was resolved.

Plaintiff's memoranda were consistent with those of a paralegal in a commercial setting, as they were well-done, and reflected completed research. However, paralegals performed a much broader scope of work than the Plaintiff did, during his fellowship, and the memoranda were not legal memoranda. Cuzzo further noted that the Plaintiff had the full freedom to manage his time.[60]

47. Following his graduation from the program, the Plaintiff related that he had a self-described major panic attack, and that he did not do anything, because he was totally wiped out, and suffered from migraine headaches for up to twenty hours per day. The Plaintiff switched medications in January, and he described himself as being in a "black hole" for about three to four months, but it was another three to five months before he felt stabilized again. During that time, he mostly slept which, in his view, was the way that his body forced him to shut down. On February 8, 2001, Dr. Egan noted that the Plaintiff had been recently seen by Alice Skadsberg

---

[60]Cuzzo saw the Plaintiff on one occasion, following the completion of his program, when he attended a community volunteer meeting of the Tenth District. During the meeting, the Plaintiff did not say a word, or participate, even though questions were asked of him, he kept his head down, he was shaking, and he kept moving his arm, as if to stretch it out. Afterward, Cuzzo spoke with the Plaintiff for about fifteen minutes and, although he tried to bring her up to date, he was incoherent, he kept shifting, and he complained of neck and back pain. He also told Cuzzo that he wondered if he could continue.

("Skadsberg"), who is an advanced nurse practitioner, or a clinical nurse specialist in psychiatry.[61] See, Exhibit 3. As such, Skadsberg, had independent prescriptive authority, but first she had to have a collaborative agreement with a psychiatrist. On that date, Egan noted that the Plaintiff's prescription for Venlafaxine[62] had recently been increased,[63] and that, while his affect was bland, his mood was euthymic, and all of the other mental status examination elements were normal. Id. On May 9, 2001, the Plaintiff arrived at Skadsberg's office "looking extremely disheveled," and he told her that he was "scattered," and that he was unable to complete any project, unless he was left completely alone. Id.

[61]Dr. Egan testified that he is the person principally in charge of the Plaintiff's treatment, and that the psychotherapists -- namely, Lund and Schwartz -- as well as Skadsberg, consulted with him about their meetings with the Plaintiff. Since their records would all have been included in the Plaintiff's file, Dr. Egan had access to them, for updates on the Plaintiff's condition. Dr. Egan, Lund, Schwartz, and Skadsberg, all prepared records, or notes, whenever they saw the Plaintiff. Dr. Egan stated that it was his practice to be as accurate as possible, when completing his records, and he believed that the other three individuals followed the same practice, and that they were honorable medical providers.

[62]Venlafaxine hydrochloride is "used as an antidepressant." Dorland's Illustrated Medical Dictionary, at 1953 (29th Ed. 2000).

[63]The Plaintiff's attorney inquired why the prescription for Venlafaxine would have been increased, to which the Defendant objected, for lack of foundation. Dr. Egan testified that he could not tell whether he, or Skadsberg, had increased the dosage, and therefore, we sustain the objection.

48. In the Plaintiff's opinion, his relationship with Maupins also ended, around that time, because of his severe mental health problems. Officially, the relationship ended in September of 2001, but she had been working in Minneapolis for three to four months before that, after selling her house in May of 2001. After his relationship ended, the Plaintiff described himself as completely overwhelmed, and he related an incident where he experienced confusion while driving, which led him to restrict his driving. The Plaintiff described himself as a recluse, from the Spring of 2001, until 2002, when he reinitiated contact with Houx, but he made an effort to get out of the house, by attending support groups on Thursday nights, for individuals with problems similar to his own, and he communicated with other individuals in Internet chat rooms. During that time, the Plaintiff also golfed, walked, and exercised, which enabled him to go off of his blood pressure medications for awhile but, when they were restarted, he experienced some side effects, such as dizziness, nausea, and decreased concentration.[64]

[64]At his deposition, in April of 2002, the Plaintiff testified that he exercised every day, he walked every day, he golfed two to three times per week, since he had a season pass at the Nemadji golf course, he worked on the computer, he did his own housework, he went to the movies, and he had dinner with his sister. Additionally, he testified that he had taken trips to Europe, to Branson, Missouri, to Arizona, and to

49. The Plaintiff renewed written contact with Houx in 2002, requesting that she and her brother pay for the Plaintiff's hospital bills, which she did. She received a thank you letter, which still contained some accusations, but they were not quite as vicious as his letters had been. In the late Summer, or Fall of 2002, Houx and the Plaintiff renewed personal contact, when he needed a ride to the hospital because he was having neck surgery. He had injured himself while painting his kitchen, and visited a chiropractor, as well as a regular physician. As a result of his injury, the Plaintiff was in severe pain, for which he was taking a large amount of pain medications, and using several ice packs at a time. The Plaintiff underwent an x-ray, and an MRI, and ultimately, at the recommendation of Dr. Freeman, the Plaintiff had a fusion done at the C5-7 levels. Although the Plaintiff had a long period of rehabilitation, the surgery did not result in restrictions, and he enjoyed great success. In any event, the Plaintiff's neck and back problems are unrelated to his claim for disability, and in fact, the policy contains a limitation for neck problems, because they pre-existed the start of the policy. See, Exhibit 1.

---

[64](...continued) Minneapolis.

50. Since the Plaintiff's surgery, Houx has maintained personal contact with the Plaintiff, and she sees him three to five times per week, as well as an equal number of telephone calls per week. When she visited his home in the Fall of 2002, she was shocked at the condition of his house, which was in disarray. He had clothing, papers, books, unpaid debts, and old glasses strewn everywhere. Houx offered to help him clean up the house, which she did over the ensuing two months. From that time to the present, Houx observed the Plaintiff's mood swings, in that on some days, he was "semi-happy," and not everything was wrong in the world, and then something would set him off.[65] On one occasion, Houx was trying to help him, and he started to yell at her, to which she responded by informing him that she could not allow him to speak to her that way, and she left. Houx took the Plaintiff to the grocery store once or twice per week, to church, to doctor's appointments, and to the health center two to three times per week. In comparing the Plaintiff's condition, since 2002, to the time before his mental health problems began, Houx stated that the Plaintiff's energy level was

[65]Dr. Egan's treatment note, from October 24, 2002, reflects that the Plaintiff reported that he was doing reasonably well, that his moods had been pretty good, and that he was not having any problems with anxiety attacks, or generalized anxiety. See, Exhibit 3. Dr. Egan testified that the Plaintiff's anxiety was in full remission, as of that date, and that his depression was much improved at that time. Id. Further, the Plaintiff's mental status examination revealed normal findings. Id.

lower than it was in Florida, he grew frustrated with tasks that used to come easily, and he sometimes had difficulty focusing, and staying on task. The Plaintiff's sleep patterns were erratic, and certain problems would become overwhelming, such as when his sump pump needed repairs. His letters to Houx did not stay focused, and contained grammatical and spelling errors. The Plaintiff's grooming and appearance declined, and he had significant problems with diarrhea, and gas. However, in comparison to the Plaintiff's condition in 1997 and 1998, when he lived with Houx, the Plaintiff, since 2002, had periods where he could function, and he was not as belligerent.

51. Following the death of his brother from cancer, in December of 2002, the Plaintiff reportedly had a panic attack. In February of 2003, the Plaintiff reported that he was sleeping in excess of twelve hours per day, and he continued to have problems with diarrhea. See, Exhibit 3. However, the Plaintiff was not endorsing neurovegetative signs of depression, with the exception of sleeping too much. Id. Upon mental status examination, the only variance from his previous appointment in October of 2002, was that his mood was dysphoric. Id. Dr. Egan noted the Plaintiff's hypertension, in his treatment note of June 12, 2003, but he stated that the Plaintiff's hypertension had been a consistent diagnosis, and did not affect his mental

health condition, other than in the sense that an individual could have side effects from the blood pressure medications that might affect his sexual function and moods. Id. When Dr. Egan was deposed, in April of 2004, he had most recently seen the Plaintiff on March 25, 2004, at which time, the Plaintiff was complaining of occasional panic attacks, and Dr. Egan was scheduled to see the Plaintiff again in three months. Id. Dr. Egan testified that the Plaintiff had always been compliant with his medical orders, and he reiterated that his diagnosis had not changed, since the beginning of his treatment of the Plaintiff. Although Dr. Egan could not remember whether he had determined the Plaintiff's GAF score, since October of 1998, he stated that it might have fluctuated, and that symptoms, such as the ones the Plaintiff experienced, did not always remain constant, and that there would be times when they were worse than at others. Dr. Egan testified that he did not believe the Plaintiff to be capable of employment.[66] With regard to his diarrhea, Dr. Egan stated that the Plaintiff was not

[66]The Plaintiff's attorney asked Dr. Egan whether he thought the Plaintiff was capable of employment, and the Defendant objected on grounds of relevance, and lack of foundation. The Defendant interposed similar objections to questioning by the Plaintiff's attorney, as to whether certain of the Plaintiff's symptoms would have affected his employability. The objections are overruled.

Dr. Egan testified that he did not know what the Plaintiff's principal duties as

(continued...)

incontinent, and did not lose control of his bowels, so that symptom would not prevent him from working. However, Dr. Egan testified that the "checklist of symptoms" of a depressive disorder, which had previously been discussed, had caused the Plaintiff the most difficulty, and made him unemployable.

52. The Plaintiff had two other panic attacks, in the Spring of 2004, which occurred only a couple of weeks apart. In the first of those two incidents, the Plaintiff had been exercising, when he decided to go to the shopping mall, or the movie theater, and he stepped in a puddle and got wet. While he was waiting for the bus, one failed to arrive, which brought on the panic attack. Although he was able to "talk himself down," he took some medication when he arrived home, and went to bed. Two weeks later, the Plaintiff saw an advertisement for a sale at Younkers, and went shopping, but he became tired, frightened and scared. He explained that his energy level over the two years prior to Trial lasted only two to three hours. The Plaintiff's depression had reached a "level off" period, but he stated that he did not experience joy as a natural reaction, such as when he played a good round of golf. Additionally, he stated that

[66](...continued)
a paralegal were, but he stated that the tasks of reviewing, analyzing, and organizing documents, and preparing memoranda about those documents, were consistent with his understanding of a paralegal's duties.

his memory and concentration had decreased each time he has had a "major fallout," that his physical dexterity on the computer was gone, which lessened his ability to sit down and type papers. The Plaintiff also described ongoing problems with diarrhea, and gas, and he stated that he had crying spells, during his bouts of depression. In the Plaintiff's opinion, he can not work at any job, because he is unable to work on a regular basis, get to work, or stay awake, and because his quality of work is unacceptable, on some days. He further claimed that he could not perform any of the duties of a paralegal, within the time allotted in a commercial setting.

53. The Plaintiff acknowledged that there were paralegals that work on a contract basis, or work part-time, as well as some that have flexible hours, or are able to work out of their home. In fact, after the Plaintiff was first diagnosed with a mental health condition, he worked out of the home where he was staying, and he worked what hours he could. The Plaintiff also acknowledged that there were less stressful positions for paralegals, as compared to his previously held position in Florida. Shortly after his termination of employment, he sent out three resumes, and received positive replies on at least two of them, but he was unable to attend the interviews, due to his panic attacks and, since that time, the Plaintiff had not inquired about working with any firm, either with flexible hours, or part-time, and he had not worked, even

part-time, after the beginning of his disability. The Plaintiff testified that, even with the accommodations of flex-time, or part-time work, he would not be able to perform the duties of a paralegal, because he could not complete the work productively, or satisfactorily. He placed his name on the Minnesota roster of mediators, but he has not actively sought employment in that field.[67] Although the Plaintiff claimed to have sought vocational counseling or rehabilitation, with an individual in mental health services, he could not recall when, and his testimony from his second deposition, on November 5, 2003, established that he had not, as of that date, sought such services.

54. During the Trial, the Plaintiff was taking prescriptions for Flexeril, Ultram, Klonopin, Lomotil, Lexapro, Cytotec, Voltaren, and Trazodone.[68]

---

[67]The Plaintiff considered a career in mediation and arbitration, and he considered the possibility of setting up a partnership with someone else, due to his mental health problems.

[68]Flexeril "is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions." Physicians' Desk Reference, at 1931 (59th Ed. 2005).

Ultram "is indicated for the management of moderate to moderately severe pain in adults." Physicians' Desk Reference, at 2553 (59th Ed. 2005).

Klonopin "is indicated for the treatment of panic disorder, with or without agoraphobia." Physicians' Desk Reference, at 2895 (59th Ed. 2005).

(continued...)

55. Contrary to the Plaintiff's position, and based on the Record, as we have detailed it, we find that the Plaintiff was able to perform at least one of the principal duties of his previous occupation as a paralegal. We further find that, when the Plaintiff's disability benefits were terminated in August of 2000, the Plaintiff's conditions had improved to a point where he was no longer disabled, under the terms of the policy.

---

[68](...continued)

Lomotil is a "trademark for preparations of diphenoxylate hydrochloride and atropine," which is "used as an antidiarrheal." Dorland's Illustrated Medical Dictionary, at 506, 1026 (29th Ed. 2000).

Lexapro "is indicated for the treatment of major depressive disorder." Physicians' Desk Reference, at 1282 (59th Ed. 2005).

Cytotec "is indicated for reducing the risk of * * * gastric ulcers in patients at high risk of complications from gastric ulcer." Physicians' Desk Reference, p. 3111 (57th Ed. 2003).

Voltaren is indicated for relief of signs and symptoms of osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. Physicians' Desk Reference, at 2395 (59th Ed. 2005).

56. The attached Memorandum is expressly made a part of these Findings of Fact, insofar as the Memorandum contains factual findings.

## III. Conclusions of Law

1. The Court has jurisdiction over the subject matter of this action pursuant to Title 28 U.S.C. §1332(a)(1). Personal jurisdiction over the named Defendant is proper, and the venue of this Court is appropriate by virtue of Title 28 U.S.C. §1391(a).

2. On this Record, we conclude that the Plaintiff's claim is limited to one for total disability benefits, for reasons which are expressed in the accompanying Memorandum.

3. Section 1.2 of the policy, which defines total disability, states that, "[u]ntil the end of the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation" and, "[a]fter the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation and is not gainfully employed in any occupation." Exhibit 1. Additionally, the policy contains a definition of partial disability, which states that "[t]he Insured is partially disabled when * * * he is unable to perform one or more principal duties which accounted for at least 20% of the time he spent at his occupation before the

disability started * * *." Our Court of Appeals has held that, in order to be totally disabled, within the meaning of the provisions of the policy at issue in this case, an individual "must be unable to perform **all** principal duties of his regular occupation." Miller v. Northwestern Mutual Life Ins. Co., 392 F.3d 973, 977 (8th Cir. 2004)[emphasis added],[69] citing McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 588 (8th Cir. 2002)(interpreting similar provisions of a different policy to likewise require a claimant to show that he or she is unable to perform all of the important duties of his position). To put the matter another way, if the Plaintiff was able to perform even one of his principal duties, he was not totally disabled. Id. Accordingly, in view of the Record presented, and our Finding that the Plaintiff was able to perform at least one of the principal duties of his previous occupation as a paralegal, we conclude that the Plaintiff was not totally disabled, when his benefits were terminated in August of 2000.

[69]We note that the Plaintiff objected, in a letter dated January 4, 2005, to the Defendant's post-Trial submission, which appended the Court of Appeals' Opinion in Miller v. Northwestern Mutual Life Ins. Co., 392 F.3d 973 (8th Cir. 2004). However, at the Trial, the Defendant cited the opinion of the District Court of Minnesota, the Honorable Paul A. Magnuson presiding, in Miller, and our own research would undoubtedly have uncovered the subsequent opinion. Accordingly, we overrule the Plaintiff's objection to the Defendant's post-Trial submission, as without merit.

4. The attached Memorandum is expressly made a part of these Conclusions of Law, insofar as the Memorandum contains legal conclusions.

IV. Order

That, given the foregoing Findings of Fact and Conclusions of Law, the Court directs that Judgment be entered in favor of the Defendant Northwestern Mutual Life Insurance Company.

BY THE COURT:

Dated: March 31, 2005

s/Raymond L. Erickson

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

M E M O R A N D U M

As an initial matter, we address whether the Plaintiff's cause of action encompasses a claim for partial disability, as well as total disability. "The essential function of notice pleading 'is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" Northern States Power Co. v. Federal Transit Admin., 358 F.3d 1050, 1056-1057 (8th Cir. 2002), quoting Ogalala Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 714 (8th Cir. 1979). Thus, "'[i]t is the facts well pleaded, not the theory of recovery or legal conclusions' that state a cause of action and put a party on notice." Hopkins v. Saunders, 199 F.3d 968, 973 (8th Cir. 1999), cert. denied, 531 U.S. 873 (2000), quoting Economy Housing Co. v. Continental Forest Products, Inc., 757 F.2d 200, 203 (8th Cir. 1985); see Parkhill v. Minnesota Mutual Life Ins. Co., 286 F.3d 1051, 1057-1058 (8th Cir. 2002); see also, Morgan Distributing Co., Inc. v. Unidynamic Corp., 868 F.2d 992, 995 (8th Cir. 1989)(A party may not obtain relief where the theory of recovery is based on a wrongful act that was not alleged in the pleadings). Applying those principles, our Court of Appeals has observed that, "while we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle the parties to manufacture claims, which were not pled,

late into the litigation for the purpose of avoiding summary judgment," see Northern States Power Co. v. Federal Transit Administration, supra at 1057, or for that matter, an adverse ruling at Trial.

In his Complaint, the Plaintiff alleges that the parties entered into a contract for the provision of "long-term disability benefits," and that the Defendant "provided long term disability benefits to the Plaintiff." Docket No. 1, at ¶¶ 3 and 5. The Plaintiff further alleges that the "Defendant discontinued making long term disability payments indicating that the Plaintiff was no longer **totally disabled**," and that the Defendant is in breach of its contract with Plaintiff as a result of its discontinuation of benefits." Id. at ¶¶ 7-8 [emphasis added]. Finally, the Plaintiff alleges that he "remains **totally disabled**." Id. at ¶ 9 [emphasis added]. Although the Plaintiff now asserts that the references to "long term disability benefits" encompass a claim for partial disability benefits, as well as total disability benefits, the words "partial disability" are completely absent from the Complaint. Rather, we find that the use of the phrase "long term disability benefits," in this context, refers solely to a claim for total disability benefits.

Our conclusion is borne out by the ensuing representations, or lack thereof, of the parties.[70]

Although the Plaintiff's counsel claimed at Trial, that he had first learned of the Defendant's attempts to limit the Plaintiff's claim to one of total disability, in the Defendant's opening statement, the Record demonstrates otherwise. At the Plaintiff's

---

[70]The Plaintiff places particular emphasis on the Defendant's Answer, in which it pleads, as an Affirmative Defense, that the "Plaintiff is not, and was not, totally or partially disabled," and the Defendant's answer to at least one Interrogatory, which also discusses partial disability. The Defendant contends that it employed a "belt and suspenders" defense, in the event that the Plaintiff amended his Complaint, which he never did. We find the Defendant's position to be a reasonable, and credible one, and neither its Answer, nor its Answers to Interrogatories, can transform the Plaintiff's cause of action into something which it is not -- namely, a claim for partial disability.

Furthermore, if we were to similarly examine the Plaintiff's representations, throughout the course of discovery, we would find a communication to the Defendant, dated February 28, 2003, in which it asks the Defendant several questions focused solely on the Plaintiff's claim that he is totally disabled. See, Docket No. 32, Exh. A. For example, the Plaintiff asks whether the Defendant "dispute[s] the amount of $2,596.00 as a monthly benefit payable to Mr. Budzak, **assuming Mr. Budzak is totally disabled as defined by the policy**." Id. [emphasis added]. No similar question is posed, in which a damages amount is calculated based on the assumption that the Plaintiff is partially disabled. Furthermore, in the next question, the Plaintiff asserts that the Defendant terminated the Plaintiff's payment of benefits, claiming that the Plaintiff "was not totally or partially disabled," and yet the Plaintiff then singularly asks the Defendant to explain the basis "for the claim Mr. Budzak is not totally disabled," again without any follow-up question on partial disability. Id. However, we use the Plaintiff's comments, in this instance, only to illustrate our point, and we do not place any weight on them, in rendering our decision, as to this issue.

first deposition, which occurred on April 16, 2002, he was asked whether it was his claim that he was totally disabled or partially disabled, to which the Plaintiff responded that he was "[t]otally disabled." See, Budzak Deposition, Volume I, at p. 28. During his second deposition, on November 5, 2003, the Defendant again asked the Plaintiff whether his claim was limited to a claim for total disability, to which he responded that it was. See, Budzak Deposition, Volume II, at pp. 81-82. The Defendant probed further, and asked whether the Plaintiff was making any claim for partial disability, and after first deferring the question to his attorney, the Plaintiff stated that he believed that his Complaint stated that he was claiming total disability. Id. at p. 82. The Plaintiff's testimony was confirmed at Trial, and he additionally stated that he had been totally disabled, since 1997.

Furthermore, in the Defendant's Trial Brief, which was filed on April 19, 2004 -- approximately two weeks before Trial -- it argues, in its first bolded Heading, that "**Budzak's Claim Is Limited To Total Disability**," and that "**He Has Made No Claim For Partial Disability**." Docket No. 41, at p. 5 [emphasis in original]. Under that Heading, the Defendant specifically references the Plaintiff's testimony at each of his depositions. In contrast, the Plaintiff's Trial Brief, which was also filed on April 19, 2004, contains absolutely no reference to partial disability. In his Statement of the

Case, the Plaintiff recites only the provision of the policy, which pertains to total disability, and states that "Budzak is totally disabled by anxiety, depression and physical side effects from his medications." Docket No. 48, at pp. 1-2. In the "Argument" section of the Trial Brief, the Plaintiff solely argues that "**Budzak is totally disabled**." Id. at pp. 19-25.

Finally, as the Plaintiff himself noted, the Defendant again flagged the issue in his opening statement. Practically the first words uttered by the Defendant were that the Plaintiff has only claimed total disability, and that he had made no claim for partial disability. The Plaintiff's own opening statement buttresses the Defendant's conclusion, because he asserted that he met the requirements of the policy, and then cited solely to the provision for total disability.[71]

The Plaintiff's representations to the Court and to opposing counsel, both spoken and unspoken, demonstrates that his cause of action was limited to a claim for total disability, and did not include a claim for partial disability benefits. The Plaintiff was clearly on notice of the Defendant's position, concerning the extent of the

[71]We further credit Schwallie's testimony, that neither the Plaintiff, nor his attorneys, ever characterized the claim as one for partial disability and, from the beginning of the claim, up until the present time, the Defendant had treated the claim as one for total disability only.

Plaintiff's claims, and he had ample opportunity to disabuse the Defendant of that notion, if it was incorrect. He failed to do so, and in fact, it was not until the last day of Trial that the Plaintiff made any mention of a claim for partial disability, during Schwallie's testimony. Accordingly, we conclude that the Plaintiff did not plead a claim for partial disability, and that his subsequent conduct prevented him from interposing such a claim on the last day of Trial. Nor can it be properly argued that the Plaintiff's Complaint should be amended, so as to conform to the evidence, in order to incorporate a partial disability claim, as the Defendant objected to any such amendment throughout the testimony. As a result, we consider only whether the Plaintiff was totally disabled under the policy. To do otherwise would unfairly prejudice the Defendant, and reward the Plaintiff for a Trial by ambush stratagem.

As we have previously stated, our Court of Appeals has recently interpreted language, which is nearly identical to that at issue here. In Miller v. Northwestern Mutual Life Ins. Co., supra, the Court held that, in order to be totally disabled, within the meaning of the provisions of the policy at issue in this case, an individual "must be unable to perform **all** principal duties of his regular occupation." Id. at 977, citing McOsker v. Paul Revere Life Ins. Co., supra at 588. In Miller, the plaintiffs urged the Court to adopt the definition of "total disability," which was found by the Minnesota

Supreme Court in Weum v. Mutual Benefit Health & Accident Ass'n, 54 N.W.2d 20 (Minn. 1952), to mean "that a person is totally disabled for insurance purposes if she or he is 'unable to perform the **substantial and material acts** necessary to the successful prosecution of his occupation or employment **in the customary and usual way**.'" Id. at 976 [emphasis in original], quoting Weum v. Mutual Benefit Health & Accident Ass'n, supra at 26. The Court, in Miller, held that Weum was inapposite, because the language in the two cases was materially different. The Court similarly rejected the plaintiffs reliance on Laidlaw v. Commercial Ins. Co. of Newark, 255 N.W.2d 807, 811-12 (Minn. 1977), and Blazek v. North Am. Life & Cas. Co., 87 N.W.2d 36, 40 (Minn. 1957).[72]

---

[72]Here, the Plaintiff appears to advance the same argument, as did the plaintiffs in Miller, and even cites two of the same cases -- Laidlaw and Blazek. See, Docket No. 48, at pp. 20-21. We follow the Court's decision in Miller, and reject the Plaintiff's argument that "total disability" means that a person is unable "to perform the substantial and material parts of one's occupation in the customary and usual manner and with substantial continuity." Laidlaw v. Commercial Ins. Co. of Newark, supra at 812.

Furthermore, the other cases cited by the Plaintiff are similarly inapposite. See, Metropolitan Life Ins. Co. v. Blue, 133 So. 707 (Ala. 1931)(employing the "usual and customary way" standard); Mitchell v. Eastman Kodak Co., 910 F. Supp. 1044, 1049 (M.D. Pa. 1995)(requiring that a claimant prove that he was "totally and continuously unable to engage in any substantial Gainful [sic] work"), aff'd, 113 F.3d 433 (3rd Cir.
(continued...)

The Court more fully explained its reasoning, in McOsker v. Paul Revere Life Ins. Co., in interpreting the language of a policy, which included both a provision for total disability, as well as for residual disability. After affirming the District Court's holding ,that "in order to recover for total disability * * * [the plaintiff] must be unable to perform any of the important duties of his position," and that "he was obligated to show that his disability prevented him from performing all of those duties, not just some of them," the Court stated, as follows:

> The circumstance that in our minds most plainly supports this interpretation is that the policy allows for benefits for "Residual Disability" when the insured is "unable to perform one or more of the important duties" of his or her occupation. It is evident to us that a person who can perform some but not all of his or her important duties has a "Residual Disability" within the meaning of the policy, and that therefore in order to be eligible for total disability payments a person would be required to show that he or she was unable to perform any of those important duties.

---

[72](...continued)
1997); Getz v. Equitable Life Assur. Soc. of U.S., 561 P.2d 468 (N.M. 1977) (requiring a claimant to show that he was "wholly and continuously unable * * * to engage in any occupation"). The Plaintiff also cites Cohen v. Secretary of Dep't of Health and Human Serv., 964 F.2d 524 (6th Cir. 1992). In a claim brought under the Social Security Act, such as in Cohen, a claimant is entitled to benefits only if he or she cannot perform any kind of "substantial gainful work." Such a requirement is inherently different from the language of the policy provisions at issue here, and therefore, it is also inapplicable.

> We believe that it is not otherwise possible to give effect to both parts of the contract.

Id. at 588.

The Court went on to note that the construction "conforms with the result reached by other courts that have been faced with interpreting identical or substantially identical contract language." Id. [citations omitted].

In accordance with the Court's decisions in Miller, and McOsker, we conclude that, in order to succeed on his claim for total disability, the Plaintiff must not be able to perform even one of his principal duties of his former occupation, as a paralegal. However, the Record plainly demonstrates that he was able to do so. The Plaintiff excelled in a program of study -- Legal Studies and mediation -- which was substantially similar to, and involved some of the same principal duties as, his prior occupation as a paralegal. Of significant import, the Plaintiff was engaged in that program of study, immediately before, and after, the termination of his benefits. As a paralegal, the Plaintiff was routinely required to write letters, conduct research, summarize depositions, prepare witnesses and exhibits, attend Trial, and even perform mediations.[73] Throughout his course of study at both LSC and UWS, the Plaintiff

[73]In documents submitted to the Defendant, the Plaintiff identified his job as a (continued...)

engaged in the same, or substantially similar tasks, from which he frequently drew on his previous experience. Generally, the Plaintiff's classes involved participatory interaction, research, oral presentations, term papers, and examinations, which Cuzzo testified were similar to some duties that are performed by paralegals. In fact, she stated that the Plaintiff's work was even more demanding than a paralegal's work, because he was held to academic standards. Similarly, during the course of the Plaintiff's fellowship with Cuzzo, he performed research, completed analyses of various programs, and prepared a survey, all of which represented facets of work that a paralegal might be required to do. The Plaintiff also acknowledged the similarity of his course of study, and assignments, to his duties as a paralegal.

More specifically, the Plaintiff compared a map project, which he completed for one of his classes at LSC, to "doing charts and preparing exhibits," and he testified that he was able to use his background in preparing Trial exhibits, and documentation for experts. Similarly, in Mock Trial, the Plaintiff was involved in reviewing affidavits, developing a case strategy, outlining witness testimony, and presenting the case, which

---

[73](...continued)
paralegal in civil litigation, specializing in construction litigation, and he listed his duties, which included, inter alia, report letters, trial attendance and analysis, discovery document review, and deposition preparation. See, Exhibit 25.

are nearly identical to several of the principal duties that the Plaintiff performed as a paralegal. The Plaintiff specifically testified that preparing for Trial was one of his principal duties as a paralegal, and he did that in his participation in Mock Trial. Further, the Plaintiff's mediation courses paralleled his prior experience in conducting mediations, through his work at the law firm, and he testified that his mediation classes required him to perform the same duties that he had previously done as a paralegal, and used the same skills. Even outside of the school context, the Record is replete with letters composed by the Plaintiff, and sent to the Defendant, in which he analyzed the terms of the policy, outlined his position as to the Defendant's practices, assembled facts, and attached documents.

The Plaintiff emphasizes that the assignments he completed in his courses were different from his work as a paralegal, in terms of the time he was afforded to complete the projects, and we recognize the Plaintiff's subjective belief that his work was not at the same level, or quality, as it was when he was employed as a paralegal. However, the focus of our inquiry is on whether the Plaintiff could perform the same duties, not on whether he could perform them in "the customary and usual way," as we have explained. Moreover, we have had occasion to closely review the Plaintiff's capacity to respond, under pointed cross-examination, and found none of the deficiencies in

concentration, persistence or pace, which he subjectively reported to others. To the extent that the Plaintiff claims an inability to perform any of his duties as a paralegal, we find his testimony less than credible, for the Record before us abounds in his performance of classic paralegal tasks which were completed with clear capability, and distinction -- given his academic successes, as well as the plaudits of those who had to assess his work academically.[74] Notably, the tasks involved written and oral

---

[74]Similarly, we do not fully accredit Dr. Egan's assessment about the Plaintiff's capacity to be employable. Our task is one of interpreting an insurance contract in the context of the evidentiary Record presented, which was not a task presented to Dr. Egan. Further, we find Dr. Arbisi's assessment of the Plaintiff, as complemented by the medical record as a whole, consistent with our finding and conclusion, that the Plaintiff is not totally disabled from performing at least one function of a paralegal, and we credit that assessment as the more convincing.

In assessing the believability of the witnesses, including Dr. Arbisi, we have weighed their demeanor, and the consistency of their testimony with both common sense, and with the Record in its totality. Dr. Arbisi deported himself well as a witness, and he responded directly, and forthrightly, to the questions asked. Although we had the opportunity to view Dr. Arbisi's testimony, in person, we afforded no less weight to the testimony of Dr. Egan, simply because it was presented by way of a deposition. "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Rule 52(a), Federal Rules of Civil Procedure; see also, Anderson v. City of Bessemer, 470 U.S. 564, 573-74 (1985)("This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts."); Gelco Corp. v. Coniston Partners, 811 F.2d 414,

(continued...)

communication, publicly, and in one-to-one exchanges with others, consistent with the tasks which are routinely, and ordinarily, performed by paralegals. We do not say that the Plaintiff can be the best-ever paralegal, as he may expect of himself, for that is not the test -- he is capable of performing a whole range of paralegal duties, and not simply one such duty. Accordingly, he is not totally disabled within the meaning of the applicable policy.

In sum, we find and conclude, on this Record, that, at the time his total disability benefits were terminated, the Plaintiff was able to perform at least one of his principal duties as a paralegal. Accordingly, the Plaintiff is not "totally disabled," within the meaning of the policy, and he is not entitled to an award of benefits.

R.L.E.

---

[74](...continued)
418-19 (8th Cir. 1987)("It makes no difference that the district court's finding was based solely on an evaluation of documentary evidence, including affidavits and depositions."), citing Anderson v. City of Bessemer, supra at 574.